KUNKEL, Respondent

v.

UNITED SECURITY INSURANCE COMPANY OF NEW JERSEY,
Appellant

(168 N.W.2d 723)

(File No. 10570. Opinion filed June 11, 1969)

**Braithwaite, Cadwell & Braithwaite,** Sioux Falls, for defendant and appellant.

**John E. Burke,** Sioux Falls, for plaintiff and respondent.

HOMEYER, Judge.

The defendant, United Security Insurance Company, hereafter called United, issued to the plaintiff, Charles G. Kunkel, a public liability insurance policy insuring him against claims for

death or bodily injury and property damage resulting from the operation of Kunkel's automobile. The limits of the policy for death or bodily injury were $25,000 for one person and $50,000 for one accident and $5,000 for damage to property. While this policy was in force Kunkel drove his car into the rear of an automobile being driven by Richard D. Ronken. In a subsequent suit Ronken recovered judgment against Kunkel for $45,022.28 for damages to his person and property upon a verdict by a jury. Thereafter, United paid its policy limits of $25,000 for bodily injury, and $1,224 for property damage, together with interest to date of payment, and costs.

This action was brought by Kunkel to recover the unpaid portion of the judgment, $18,798.58, with interest, from United, plus damages for mental suffering and punitive damages.[1] The complaint alleged the prior suit and judgment; the issuance of the aforementioned insurance policy and defense of the suit by United; an offer to United to settle for $25,000 before the jury verdict; that United knew, or in good faith should have known, that the jury would render a verdict in excess of liability coverage, and did not in good faith refuse to settle or attempt to settle the claim.

United defended on the basis (1) that the offer of $25,000 was not accepted because of prior instructions from Kunkel[2] and (2) that United had in good faith discharged its obligations under the policy of insurance. Trial resulted in a jury verdict for $18,798.58 plus interest together with damages of $10,000 for mental suffering and judgment was entered thereon. Motion for judgment n. o. v. and in the alternative for a new trial was denied and this appeal followed.

The principal questions presented are the sufficiency of the evidence to sustain the verdict, and if we so hold, whether damages should be allowed for mental suffering.

1. The claim for punitive damages was stricken by the court at the commencement of the trial upon Kunkel's motion.

2. Kunkel denied any such instruction. This issue was submitted to the jury under conflicting evidence and the jury was told if it found Kunkel concurred in United's decision not to accept the offer, he could not recover. The jury decided this issue adversely to United's contention.

## Sufficiency of the Evidence

The policy was a standard family automobile policy and contained the usual provisions requiring United to defend any suit against Kunkel and gave the company the right to make such investigation and settlement of any claim or suit as it deemed expedient.

Although there has been no prior expression from this court on the subject, it is well established that an insurance company which has issued a liability insurance policy limited in the amount of its coverage may so conduct itself so as to be liable for the entire judgment recovered against its insured irrespective of policy limits. For a collection and discussion of cases from other jurisdictions, see Annot., 40 A.L.R.2d 168, and Later Case Service, Vol. 4, page 649; Keeton "Liability Insurance and Responsibility for Settlement", 67 Harvard Law Review, 1136, and "Ancillary Rights of the Insured Against His Liability Insurer", 28 Ins.C.J. 395; Wymore, "Safeguarding Against Claims in Excess of Policy Limits", 28 Ins.C.J. 44; "Insurer's Liability To Insured for Judgments Exceeding Policy Limits", 7 Drake Law Review 23; (May, 1958) 7 Am.Jur.2d, Automobile Insurance, 155 et seq.; 45 C.J.S. Insurance § 936; 7A Appleman, Insurance and Law Practice, §§ 4712, 4713.

Courts differ as to the degree of proof which the insured must make in order to recover any excess above policy limits. Some have held that where an insurer has assumed control of the defense and it has the opportunity to settle the claim within policy limits, it must do so, if that is the reasonable thing to do and it may be liable for negligently failing so to do. 45 C.J.S. Insurance § 936b, and cases shown in note 23. Other courts hold the insured to a high degree of proof and to show fraud or bad faith, and seem to equate one with the other. City of Wakefield v. Globe Indemnity Co., 246 Mich. 645, 225 N.W. 643. A few courts have held that either bad faith or failure to use ordinary care may lead to liability. Southern Farm Bureau Cas. Ins. Co. v. Parker, 232 Ark. 841, 341 S.W.2d 36; Cernocky v. Indem. Ins.

Co. of North America, 69 Ill.App.2d 196, 216 N.E.2d 198. However, even in so-called strictly bad faith jurisdictions, courts hold that the character and extent of an insurer's negligence are factors to be considered by the trier of fact in weighing the matter of bad faith. Baker v. Northwestern Nat. Cas. Co., 26 Wis.2d 306, 132 N.W.2d 493.

In Hilker v. Western Automobile Ins. Co., 204 Wis. 1, 231 N.W. 257, 235 N.W. 413, in discussing bad faith and negligence in this area of the law, the court made the following observation on the use of such terms:

> "Terms which are not strictly convertible or synonymous have been used by different courts to indicate the same thing. Negligence has been used by some courts to mean the same thing that other courts have designated as bad faith. Bad faith, especially, is a term of variable significance and rather broad application. Generally speaking, good faith means being faithful to one's duty or obligation; bad faith means being recreant thereto. In order to understand what is meant by bad faith, a comprehension of one's duty is generally necessary, and we have concluded that we can best indicate the circumstance under which the insurer may become liable to the insured by failure to settle by giving with some particularity our conception of the duty which the written contract of insurance imposes upon the carrier."

Appleman in his well known text on insurance cited supra has said that the two terms "bad faith" and "negligence" are often used interchangeably by courts and "that the conclusion must be drawn that mere terminology means little. It is rather the factual situation which is significant in the light of the duty which exists, and normally the trier of fact must make the determination of liability or nonliability."

The trial court submitted the matter to the jury under the bad faith rule which we believe to be the better rule and the one prevailing in the majority of jurisdictions and we ap-

prove it. See 7 Am.Jur.2d, Automobile Insurance, § 156. However, as stated supra, the character and extent of the insurer's negligence are factors to be considered by the trier of fact in determining if there is bad faith. The insured has the burden of establishing his claim by a preponderance of the evidence.

■ Good faith is a broad and comprehensive term. Whether an insurer had adhered to it usually depends upon circumstances and elements involved in a particular case. The decision not to settle must be thoroughly honest, intelligent, and impersonal. It must be a realistic decision tested by the expertise which an insurer necessarily assumes under the terms of its policy. Where the insurer recognizes liability and the probability of a verdict in excess of policy limits circumstances constituting a failure to exercise good faith may weigh in favor of an insured. Exposure to a potential judgment against which there is only partial protection makes it obvious that ordinarily there is a conflict of interest when the opportunity arises to settle a claim within the coverage of the policy.

■ When can it be said that an insurer has breached its duty to exercise good faith? While no single satisfactory test has been formulated as to what constitutes good or bad faith courts uniformly hold that the insured's interests must be considered. It appears to have been most frequently held the insured's interests must be given "equal consideration" with those of the insurer, Farmers Insurance Exchange v. Henderson, 82 Ariz. 335, 313 P.2d 404, Brown v. Guarantee Ins. Co., 155 Cal. App.2d 679, 319 P.2d 69, 66 A.L.R.2d 1202, or as it is often expressed "at least equal consideration". Am.Fidelity & Cas. Co. v. G. A. Nichols Co., 10 Cir., 173 F.2d 830; Potomac Ins. Co. v. Wilkins Co., 10 Cir., 376 F.2d 425. Sometimes the duty to exercise good faith and give equal consideration is expressed by telling the jury that in making the decision whether to settle or try a case, the insurer must in good faith view the situation as it would if there were no policy limits applicable to the claim. Am. Fidelity & Cas. Co. v. L. C. Jones Trucking, Okl., 321 P.2d 685; Cowden v. Aetna Cas. & Surety Co., 389 Pa. 459, 134 A.2d 223; Bowers v. Camden Fire Ins. Asso., 51 N.J. 62, 237 A.2d 857; Murach v. Mass. Bond-

ing & Ins. Co., 339 Mass. 184, 158 N.E.2d 338. The enunciation of this rule is not difficult, but its application may be **troublesome.** It has been said to be "a matter of consideration of comparative hazards." Farmers Insurance Exchange v. Henderson, supra.

In Brown v. Guarantee Ins. Co., supra, the California court lists some factors which should be considered in deciding whether an insurer's refusal to settle constituted a breach of its duty to exercise good faith; namely: (1) the strength of the injured claimant's case on the issues of liability and damages; (2) attempts by the insurer to induce the insured to contribute to a settlement; (3) failure of the insurer to properly investigate the circumstances so as to ascertain the evidence against the insured; (4) the insurer's rejection of advice of its own attorney or agent; (5) failure of the insurer to inform the insured of a compromise offer; (6) the amount of financial risk to which each party is exposed in the event of a refusal to settle; (7) the fault of the insured in inducing the insurer's rejection of the compromise offer by misleading it as to the facts; and (8) any other factors tending to establish or negate bad faith on the part of the insurer.

Several of the factors mentioned by the California court are not in issue in the case at bar. For instance there was never any request for contribution by the insured. There is no suggestion that the insurer was negligent in its investigation of the facts and circumstances surrounding the accident unless possibly a follow-up on the extent of the injuries after surgery and before trial.[3] Although the insurer's attorney did not specifically advise settlement, it does appear he forewarned of a strong case on liability, very serious injuries, and the great probability of a verdict in excess of policy limits.

Counsel for United recognizes it is now clear by hindsight that it would have been better for both the insured and the in-

---

3. United appears to have had in its possession a somewhat negative report on serious injury from Dr. Van Demark made following an examination on March 16, 1963. Neither Dr. Van Demark nor any other doctor made a physical examination of Ronken to determine his postoperative condition until September 30, 1964, when Dr. Van Demark appears to have made a somewhat cursory examination on the last night of trial preparatory to taking his deposition.

surer to have accepted the offer in settlement, but he says United's refusal to settle should not be tested by hindsight. In Ferris v. Employers Mutual Cas. Co., 255 Iowa 511, 122 N.W.2d 263, 268, the court said:

"While it may be in the light of what happened that Monday morning quarterbacks, as is their privilege and custom, disagree with the plays called on the previous Saturday afternoon, must we say that the signal caller was guilty of bad faith in choosing the plays as he did? * * * Again there is the implication that we should judge the fairness of the decision not to settle by the result. We suggest that if we are to venture into the area of what counsel 'should have known' in advance of the trial of a lawsuit as shown by the final outcome, by a jury's decision, we are requiring of him the gift of foretelling the future not often given to mankind. We know of no mortal who has been vouchsafed this power since the days of the Bible prophets; and as we understand it, these ancient seers had access to some inside information not presently available to counsel in damage cases. * * * We may not measure the reasonableness of the offer by the ultimate result of the litigation; it must be considered in the light of the case as it fairly appeared to the insurer and its authorized agents and attorneys at the time the offer was made."

We now turn to some of the facts and cirmumstances we deem pertinent. The entire file including exhibits and a transcript of testimony in the case of Ronken v. Kunkel was received in evidence and is a part of the record on review. The accident occurred on Sunday, September 2, 1962, at about 1:45 a. m. on State Highway 38 when Kunkel's automobile crashed into the rear of Ronken's car which was traveling east at a speed of about 50 miles per hour. Ronken's car was forced into the south ditch, struck a service road, catapulted into the air and then nose-dived into the ground. Ronken was torn loose from the steering wheel and thrown against the dashboard back first.

He rode to the hospital in an ambulance and received out-patient treatment. Pain persisted primarily in his lower back region and he was treated by doctors and osteopaths intermittently until June 5, 1964, when he consulted Dr. Manning, an orthopedist, who took X-rays which revealed several herniated intervertebral discs in the lumbar spine region. On June 11th he was hospitalized, placed in traction to relieve pain, and released on June 19th. On September 16th he was readmitted and his injury was diagnosed as "three herniated lumbar disc defects * * * showing on the third, fourth and fifth lumbar level". On September 18th Dr. Manning performed a 3-level laminectomy. Ronken experienced severe postoperative pain and was released on September 30th. He was readmitted on November 10th due to a postoperative intestinal condition and released on November 14th.

United investigated the accident and in a general way was acquainted with Ronken's condition until the time of surgery although the record is somewhat incomplete in this regard. There is some indication settlement for a small amount was attempted before suit was started. Kunkel plead guilty to the criminal charge of reckless driving following the accident.

On May 26, 1965, Ronken sued Kunkel claiming $117,598.87 in damages of which $20,000 was for punitive damages.[4] Kunkel delivered the suit papers to United who on June 1, 1965, wrote Kunkel that Ronken's claim was in excess of coverage, the name of the law firm to whom the defense was referred, his "right to employ independent counsel" at his expense if he so chose, and that the retained firm would represent his interests in excess of coverage if he so desired. Richard Braithwaite, a member of the law firm who was in charge of the litigation, wrote Kunkel to the same effect. Concerning their initial interview Kunkel testified when Braithwaite asked if he wanted another attorney he said he could not afford one "but that if he didn't think he could handle it alone (he) would try and borrow the money

---

4. Punitive damages were stricken and the case was submitted to the jury on a claim of $95,792.72 of which $5,792.72 was for special damages for doctors, hospital, loss of earnings, car damage, etc.

and get another attorney" and was told that this was not necessary since "he was obligated to defend (him) to the best of his ability."

Depositions of Ronken and Dr. Manning were taken before trial and in general disclosed the nature of the injury, persistent pain from the time of accident to the surgery, and a poor result following surgery. Dr. Manning related the injury to the accident and testified to a 50% permanent disability with a possibility of a reduction to 25% by a spinal fusion operation and additional expense connected therewith.

Ronken was 26 years old, single, and employed as a teacher and coach at a junior high school in Sioux Falls at the time of the accident. He continued to coach for two years thereafter, but was limited in his activity. Following surgery, he discontinued coaching on advice of his doctor. Lost income from coaching was from $68 to $73 per month. It is undisputed that Ronken participated in sports, principally volley ball and basketball, for about two years after the accident. United does not contend that it expected to escape liability, but strongly urges that in view of the doctor's report (see note 3) and Ronken's post accident athletic participation, it did in good faith expect that a jury would not return a verdict in excess of policy limits.

Richard Hopewell, counsel for Ronken, testified he received no firm offers of settlement at any time from United; that on September 7, 1965, at the call of the court calendar, he asked for policy limits, but they were not revealed then or at any time thereafter before judgment; on September 22nd, the day after Manning's deposition was taken, Braithwaite asked him what he thought a reasonable settlement would be and he said $50,000, but he had authority to settle for $35,000. Braithwaite responded: "Your appraisal of the case and what I consider reasonable is the difference between arithmetic and calculus."

On September 16th, prior to taking Dr. Manning's deposition, but with his medical report at hand, Braithwaite wrote United, "I don't like the information contained in those reports

one bit. The doctor's opinion (if it stands up) plus the flagrant conduct of the defendant spells dynamite. Conceivably, we might have to get a SBA loan to finance payment of the verdict." He also suggested the possibility of an independent medical, but did not advocate it at that time.

On September 22nd, after Dr. Manning's deposition had been taken, Braithwaite wrote he expected the case to be tried; that his present inclination was against an "up-to-date medical examination" depending on what Dr. Van Demark said; that he was now convinced Ronken was going to be a cripple the rest of his life, but his medical future is presently unknown; that Dr. Manning had definitely related Ronken's injuries to the September 2, 1962 accident; that if Dr. Van Demark "stands up for us" he thought they would be all right; that Dr. Manning definitely was of the opinion that Ronken would remain permanently disabled with or without a spinal fusion operation and the only question was how much; that even with the best possible progress Ronken would have a 25% permanent disability of the body as a whole.

Braithwaite further requested authorization to admit liability though it would be against company policy because he saw no basis to fight liability. He also said Ronken's lawyer had indicated the case could be settled for $35,000, but he felt we would be "completely unjustified in paying that amount or anywhere near it", but since it was an excess case he would relay the offer to Kunkel who he said "couldn't come up with $10,000 if he wanted to." He said it was a hard case to evaluate; that special damages were about $5,000; that if the jury believed Dr. Manning and disbelieved Dr. Van Demark "we are going to get stuck and we are going to get stuck big. By that, I think we would be stuck more than $35,000." If they did not believe Dr. Manning, but accepted insured's theory, he thought the verdict might be about $4,000 to $5,000.

Braithwaite concluded his long letter by saying "I rather think that if we should offer $25,000 (Ronken) would accept it; he might even accept a little less" but he did not feel justified

in offering anywhere near that amount and he saw nothing that would change his thinking unless Dr. Van Demark fell down completely and if so, he would immediately contact the company for a re-evaluation of the case.

Kunkel received a letter from Braithwaite informing him of the $35,000 offer and they talked about it over a telephone. Kunkel said he told Braithwaite he didn't have $10,000 and he doubted if he could borrow it because he had no security, and he wanted to know if he wanted him "to try and borrow it, and he said no, I don't think that's necessary." No other offers of settlement were communicated to Kunkel and there is nothing to indicate that Braithwaite informed Kunkel of the seriousness of Ronken's injuries, the expected damaging testimony of Dr. Manning, and if believed by the jury, the great probability of the verdict exceeding policy limits. The failure of the insurer to inform the insured of an offer to compromise has sometimes been regarded as evidence of bad faith. See 40 A.L.R.2d 168, 216.

Kunkel testified he told Braithwaite before the jury was selected that he wished Ronken "would take policy limits and forget about it, because I sure don't want to go to court"; that in substance he told him the same thing several times during the trial and was ignored by Braithwaite.

The record reveals that during trial of the Ronken case, Hopewell at various times indicated to Braithwaite that he felt the case could be settled within policy limits, but no firm offer was made until after the jury retired about 4 p. m. Shortly thereafter, Sam Sechser, an attorney, who Hopewell asked to associate with him on an attempted settlement, conferred with Braithwaite and a district claims manager for United, who was present during most of the trial, in the hallway outside the courtroom. It is undisputed that at that time another request was made for policy limits and refused; that United was then informed Ronken would settle the case for $25,000, or if policy limits were less, for whatever the policy limits might be; that the offer was ignored; that it was never communicated to Kunkel or to the home office; that the jury verdict was rendered about 10 p. m.

The home office claims manager of United testified that it had set up a loss reserve on the claim after suit was started of $9,500 and it was never changed. The district claims manager who attended the trial did not know the amount of the reserve, but thought it was less.

██ Ordinarily the question of good faith is a fact issue for the jury or other trier of fact. Baker v. Northwestern Nat. Cas. Co., 22 Wis.2d 77, 125 N.W.2d 370; Brown v. Guarantee Ins. Co., 155 Cal.App.2d 679, 319 P.2d 69, 66 A.L.R.2d 1202; State Automobile Ins. Co. of Columbus, Ohio v. Rowland, 221 Tenn. 421, 427 S.W.2d 30; Tenn. Farmers Mut. Ins. Co. v. Wood, 10 Cir., 277 F.2d 21. No precise formula can be prescribed for determining the sufficiency of the evidence on the issue of good faith. In Tenn. Farmers Mut. Ins. Co. v. Wood, supra, the test was thus stated:

> "If the proof, in the light of all the relevant circumstances, and inferences to be drawn therefrom is such as to leave a reasonable basis for disagreement among reasonable minds, the question of good faith of the insurer in the handling of the claim and conducting compromise negotiations is for the jury."

██ In our opinion under the record in this case and considering all of the relevant circumstances and inferences to be drawn therefrom we believe the evidence was such as to leave a reasonable basis for disagreement among reasonable minds as to the good faith of United and its agents in its handling of the claim and consequently there was a submissible issue of good faith for jury determination.

We have already alluded to some factors tending to establish Kunkel's claim. In addition the court instructed that Kunkel was liable as a matter of law and only left for jury determination the amount of damages proximately resulting from the accident. Ronken's injuries were serious. Dr. Van Demark said the result of disc surgery was poor. His prognosis of Ronken's future and percentage of permanent disability was sub-

stantially in accord with Dr. Manning's. This was known before the offer of settlement within policy limits was made. The cases are virtually unanimous in holding that when a claimant has a strong case on the issue of liability and the injuries are serious, both of these matters may have some tendency to show an insurer's rejection of an offer to settle was not in good faith. See Annot., 40 A.L.R.2d 168, 196. That Dr. Van Demark's testimony and the claimant's athletic activities, although perhaps subject to interpretation minimizing the accident as the proximate cause of Ronken's condition at the time of trial, would actually do so was at best a rather remote gamble. Likewise, it is undisputed, if the accident aggravated a pre-existing condition, Kunkel was liable for the aggravation. One of United's experts on the question of bad faith when asked concerning the issue of proximate cause admitted such issue was not very much open based upon the record.

 It does not appear as if United made either a serious offer to settle or a counter offer. Neither did they inform claimant of policy limits. We recognize that under the case law of this state when the action was tried there was no affirmative duty to disclose policy limits. See Bean v. Best, 76 S.D. 462, 80 N.W.2d 565.[5] Nevertheless, it has been recognized as relevant to evaluating a case and as an aid in achieving settlements. See Cernocky v. Indem. Ins. Co. of North America, supra. In the latter case the court said:

> "The defendant summarily and emphatically refused to discuss settlement; to inform the Marquardts of the policy limits so that they could determine if they could make an offer of settlement within the limits; or to permit plaintiffs' personal counsel to do so. Such conduct indicated that the defendant did not give equal consideration to the insured's interest."

In State Automobile Ins. Co. v. Rowland, supra, it was said that "a refusal to discuss a settlement may be considered along

---

5. In Williams v. Carr, 84 S.D. 102, 167 N.W.2d 774, decided May 14, 1969, we held policy limits were discoverable under RCP 33.

with other evidence in determining the issue of bad faith." The second of United's experts admitted that if he had handled the case he probably would have made an offer of settlement.

The record establishes that United recognized great danger of a verdict exceeding policy limits. It hardly allows any other reasonable analysis. When we consider the comparative hazards; that is, settling the case for $25,000 within policy limits, or exposing the insured to a possible verdict nearly three times in excess of that amount, we believe a jury could find that United did not exercise its duty of good faith and did not give equal consideration to its own and Kunkel's comparative hazards. General Acc. Fire & Life Assur. Corp. v. Little, 103 Ariz. 435, 443 P.2d 690; Am. Fidelity & Cas. Co. v. G. A. Nichols Co., supra.

United argues that when the firm offer was made while the jury was deliberating it came too late and could not be acted upon. While it is true most offers would be made before that time, or there would at least be some serious preliminary negotiations prior to that stage of the trial, we believe it is only another factor for consideration of the jury on the matter of good faith. We find no case where an offer to settle after the close of all of the evidence, or while the jury was deliberating, was considered decisive on the issue of bad faith. The Cernocky and Rowland cases, supra, are authority that an offer to settle within policy limits is not a prerequisite to an action to recover for excess liability. For cases in which offers to settle were made during trial, see Potomac Ins. Co. v. Wilkins Co., 10 Cir., 376 F.2d 425; State Farm Mut. Automobile Ins. Co. v. Marcum, Ky., 420 S.W.2d 113; Harvin v. United States Fidelity & Guaranty Co., Ky., 428 S.W.2d 213; Amer. Fidelity & Cas. Co. v. G. A. Nichols Co., supra. It is common knowledge among practitioners in the personal injury field that many settlements are negotiated and consummated during trial and sometimes while the jury is deliberating.

We have stated supra that the burden of proof was upon the insured to establish bad faith by a preponderance of the evidence. The court instructed that the evidence as to bad

faith must not only preponderate but in addition such evidence must be clear and satisfactory and convincing. Such is the rule in some jurisdictions. Berk v. Milwaukee Automobile Ins. Co., 245 Wis. 597, 15 N.W.2d 834; Cowden v. Aetna Cas. & Sur. Co., 389 Pa. 459, 134 A.2d 223. It originates from the premise that bad faith is a species of fraud and since one is the equivalent of the other and fraud must be proved by evidence which is clear, satisfactory and convincing, the same rule applies to bad faith. Although we have said that fraud is never presumed or lightly inferred, we have not said the burden to prove fraud required more than a preponderance of the evidence. Northwest Realty Co. v. Colling, 82 S.D. 421, 147 N.W.2d 675. We believe this to be the proper standard of proof in this type of case and the rule in most jurisdictions.

In General Acc. Fire & Life Assur. Corp. v. Little, supra, the Arizona court held that it was not error to refuse an instruction which required "bad faith" to be established by clear, convincing and satisfactory evidence, in the absence of actual fraud. See also Cernocky v. Ind. Ins. Co. of North Amer., supra, where the court distinguished fraud and bad faith, and Kohlstedt v. Farm Bureau Mutual Ins., Co., 258 Iowa 337, 139 N.W.2d 184.

### Damages for Mental Suffering

By special verdict Kunkel was awarded $10,000 in damages for mental suffering. United contends such damages are not recoverable in this action, or if they are, such damages are not sustained by the evidence and excessive.

The only evidence pertaining thereto came from Kunkel and his wife. Kunkel at the time of judgment was 31 years old, a truck driver, had one child of his own and four stepchildren. He testified after judgment he had trouble sleeping, saw a doctor who prescribed tranquilizing pills which he was still taking at time of trial, that he has been nervous and tense since the excess judgment was entered. He also testified that his wages

were garnisheed and that a body execution was outstanding against him;[6] that it had destroyed his credit.

Mrs. Kunkel testified her husband was nervous, irritable and complained of headaches after the excess verdict; that he did not sleep soundly like he did before; that because of poor credit they could not buy furniture they wanted to.

Although there has been much litigation against insurance companies for excess liability, there appear to be few cases where damages were sought or allowed for mental suffering claimed to have been proximately caused by an insurer's failure to settle within policy limits. Adjudicated cases have been termed as actions based on the contract or arising from the contract and perhaps more often as an action in tort or in the nature of a tort. See Annot., 12 A.L.R.3d 1158 and Keeton "Liability Insurance and Responsibility for Settlement"; 67 Harvard Law Review, 1136, 1138, note 5.

For tortious conduct the rule on damages is stated in SDCL 1967 21-3-1:

"For the breach of an obligation not arising from contract, the measure of damages, except where otherwise expressly provided by this code, is the amount which will compensate for all the detriment proximately caused thereby, whether it could have been anticipated or not."

For breach of contract the rule is found in SDCL 1967 21-2-1:

"For the breach of an obligation arising from contract, the measure of damages, except where otherwise expressly provided by this code, is the amount which will compensate the party aggrieved for all the detriment

---

6. On December 6, 1966, an execution was issued and delivered to the sheriff. United was served with a garnishment which was dismissed by the court on April 26, 1967, pursuant to stipulation of counsel. A second execution was issued on December 27, 1967, and served upon Kunkel's employer on January 4, 1968. On the same date Ronken made application for a body execution under SDC 1960 Supp. 33.19 and 37.25, as amended, the issuance of which was stayed until final adjudication of the instant action. The action was begun March 21, 1967 and tried February 20, 1968.

proximately caused thereby, or which, in the ordinary course of things, would be likely to result therefrom. No damages can be recovered for a breach of contract which are not clearly ascertainable in both their nature and their origin."

In Farmers Insurance Exchange v. Henderson, 82 Ariz. 335, 313 P.2d 404, where an insured's property, a laundry, was levied upon and sold under execution when no supersedeas bond was furnished pending appeal,[7] and in an action to recover an excess liability claim was also made for damages for loss of the laundry as a going business, for humiliation, pain and suffering, loss of business reputation and credit, among other things, and the court submitted such matter to the jury allowing it to assess damages therefor, the court in limiting damages to the value of the laundry as a going concern, said:

"The wrong involved is causing the destruction or conversion of insured's business property in satisfaction of the company's obligation. The court correctly instructed that as a general rule the damages for the loss or destruction or conversion of a going business is its value at the time and place of destruction with interest. This is in accord with the pronouncements of this court. Jones v. Stanley, 27 Ariz. 381, 233 P. 598. The humiliation, mental pain, suffering and anguish incurred by the Hendersons was the direct result of the pecuniary loss suffered. If it is to be considered a breach of contract, to recover for these items the contract must be of such a nature that its breach would cause mental suffering for reasons other than the pecuniary loss. Restatement of Law, Contracts, section 341. If the wrong be considered tortious by causing the destruction or conversion of Henderson's property, the same measure of damages should obtain as that for conversion or destruction of property, that is, the value of the property with interest."

---

7. The policy required the insurer to pay the premuim on appeal bonds, but it had no obligation to furnish such bonds.

In Baker v. Northwestern Nat. Cas. Co., 26 Wis.2d 306, 132 N.W.2d 493, the insured claimed damages alleging that the excess judgment damaged his credit rating and financial reputation preventing him from entering into a hunting knife enterprise which was in the planning stage, but the product had not yet been marketed. The court said such claims were too speculative to be submitted to a jury.

■ ■ It is settled law in this state that a breach of duty may arise from a contractual relationship, and while matters complained of may have their origin in contract, the gist of an action may be tortious. Smith v. Weber, 70 S.D. 232, 16 N.W.2d 537. Conduct which merely is a breach of contract is not a tort, but the contract may establish a relationship demanding the exercise of proper care and acts and omissions in performance may give rise to tort liability. Weeg v. Iowa Mutual Ins. Co., 82 S.D. 104, 141 N.W.2d 913.

■ ■ It is fundamental that damages which are uncertain, contingent or speculative cannot be made the basis of recovery. This rule is applicable in actions of contract, and with some differentiation as to a degree of certainty, to actions in tort. 25 C.J.S. Damages § 26. Where the connection between the wrong and the consequences thereof is not direct, a nearness in the sequence of events and a closeness of cause and effect must exist so that the injurious act predominates over other probable causes to produce the consequential damage before recovery will be permitted. Sutter v. Biggs, 377 Mich. 80, 139 N.W.2d 684.

In Crisci v. Security Ins. Co., 66 Cal.2d 425, 58 Cal.Rptr. 13, 426 P.2d 173, as a result of an insurer's failure to settle the insured compromised a $90,000 excess liability judgment for $22,000, a 40% interest in the insured's claim to some property, and an assignment of her claim against the insurer. The insured was a 70-year immigrant widow, became indigent, went to work as a babysitter, and her grandchildren paid her rent. As a result of the change in financial condition, her health declined, she became hysterical and attempted to commit suicide several times.

Under statutes similar to ours, the California court permitted recovery for mental suffering. However, our analysis of that case leaves the impression that its application was intended for exceptional cases. The court draws the analogy between such case and one where there was an invasion of property rights without personal injury apart from mental distress and says:

"We are satisfied that a plaintiff who as a result of defendant's tortious conduct loses his property and suffers mental distress may recover not only for the pecuniary loss but also for his mental distress."

In State Farm Mut. Automobile Ins. Co., v. Smoot, 5 Cir., 381 F.2d 331, the second case relied upon by Kunkel on this point, there again was present an invasion of property rights. Smoot testified he tried to sell his house when he moved from the city, but was unable to do so because of the judgment and lien against it. He then lost it because of inability to make payments and as a result of a foreclosure by FHA his credit was destroyed. Thus, the court said there was some evidentiary support for an award of $10,000 in general damages recoverable in tort actions under Georgia law. Mental suffering as such was not mentioned.

In the case at bar there is no evidence of what we consider an invasion of a property right similar to what occurred in the Crisci and Smoot cases. There is no evidence that Kunkel suffered any financial distress, lost either property or employment, or otherwise sustained pecuniary loss because of the excess judgment. We hold the record in this case does not support an award of damages for mental suffering.

Other assignments of error have been considered and determined to be either without merit or nonprejudicial.

The judgment should be modified to exclude therefrom $10,000 in damages for mental suffering, and as so modified, it is affirmed. No costs will be taxed.

All the Judges concur.