Lynnette KARAS, Plaintiff–Appellant,

v.

AMERICAN FAMILY INSURANCE COMPANY, INC., a Wisconsin Corporation, Defendant–Appellee.

Lynnette KARAS, Plaintiff–Appellee,

v.

AMERICAN FAMILY INSURANCE COMPANY, INC., a Wisconsin Corporation, Defendant–Appellant.

Lynnette KARAS, Plaintiff–Appellant,

v.

AMERICAN FAMILY INSURANCE COMPANY, INC., a Wisconsin Corporation, Defendant–Appellee.

Nos. 94–1089, 94–1090 and 94–1092.

United States Court of Appeals, Eighth Circuit.

Submitted June 13, 1994.

Decided Aug. 29, 1994.

Rehearing Denied Oct. 18, 1994.

Steven C. Beardsley and Steven J. Oberg, Rapid City, SD, argued, for appellant.

Robert L. Morris, Belle Fourche, SD, argued, for appellee.

Before BOWMAN and LOKEN, Circuit Judges, and WEIS,* Senior Circuit Judge

WEIS, Senior Circuit Judge.

In this diversity case, we conclude that the record does not support recovery of damages for mental anguish in claims based on an insurance agent's misrepresentations of the amount of coverage in the plaintiff's health insurance policy. Therefore, to the extent that the jury verdict included an award for mental suffering, it must be set aside. Having established a case of misrepresentation, however, plaintiff is entitled to those benefits to which she was led to believe she would receive by the agent's statements, even though the benefits were not in fact the terms of the policy. We will reverse the judgment of the district court and will remand for the entry of a judgment in the amount of the plaintiff's hospitalization expenses not yet paid by the carrier.

After giving birth to her second child by a caesarean section in June 1988, plaintiff Lynnette Karas submitted a claim to defendant American Family Insurance Company for hospital expenses totaling $4,593.09. The carrier paid the hospital $500, but denied any further liability under the policy. Plaintiff filed suit in state court seeking payment not only for the remainder of her hospital expenses, but for punitive and emotional distress damages as well. Defendant removed the case to the United States District Court for the District of South Dakota.

At trial, plaintiff testified that after her first child was born by caesarean section, her husband's health insurance company notified him that it would not pay any further maternity benefits. In early 1987, during their search for a replacement, plaintiff and her husband contacted several insurance carriers, none of whom would write a policy that would pay for caesarean sections. Plaintiff then met with William Frankman, an agent for American Family. According to plaintiff, Frankman told her that an American Family medical policy would cover caesarean sections just as it would other surgical procedures, paying 80% of the costs with the remaining 20% to be borne by plaintiff.

At trial, Frankman denied that he had made such representations. He said that he had discussed with plaintiff a policy that would provide coverage of $500 for caesarean procedures, but that if her hospital confinement exceeded six consecutive days, ex-

* The HONORABLE JOSEPH F. WEIS, JR., Senior United States Circuit Judge for the United States Court of Appeals for the Third Circuit, sitting by designation.

penses for the seventh and succeeding days would be paid on an 80%/20% basis. The policy ultimately issued to plaintiff, however, contained a waiver that eliminated the coverage for expenses incurred after a six-day hospital stay and provided only for a flat $500 benefit. Frankman testified that he delivered the policy to plaintiff at her home and that she signed the waiver at that time.

Plaintiff denied that she had seen the restrictive waiver form and said that her signature had been forged. She produced a forensic document expert to support her position on that point. Defendant in turn called an expert who testified that the contested signature on the waiver was that of plaintiff. The trial court found that the waiver had no relevance inasmuch as plaintiff had been confined to the hospital for less than the prerequisite six-day stay. The court nevertheless admitted the evidence about the alleged forgery for the limited purpose of aiding the jury to assess credibility.

Other witnesses were called to support the plaintiff's claim for mental suffering damages. Her obstetrician, her family members, and friends testified about her depression during the years following the company's denial of full insurance benefits.

The trial court dismissed the counts for negligent or intentional infliction of emotional distress and bad faith refusal to pay a claim. The judge then charged the jurors that plaintiff could prevail on the remaining claims if they found that Frankman had "either intentionally or negligently misrepresented the amount of coverage," and that plaintiff had relied on the misrepresentation to her detriment. The jury was further instructed that plaintiff could recover damages for mental anguish in addition to the policy benefits that agent Frankman had allegedly promised.

The jury returned a verdict for plaintiff in the amount of $75,000. She then filed post-trial motions for a new trial on punitive damages and for attorneys' fees. The trial judge denied the motion for a new trial on punitive damages after "conclud[ing] that there was no credible evidence upon which a reasonable belief could be formed that the defendant was guilty of willful, wanton, or malicious conduct." In a separate order, the court also denied the motion for attorneys' fees. Otherwise, the judgment in favor of plaintiff was allowed to stand.

On appeal, plaintiff reasserts her claims for punitive damages and attorneys' fees. In addition, she argues that the trial court erred in failing to instruct the jury on her claims of fraud and deceit, breach of duty of good faith, and negligent or intentional infliction of emotional distress. Defendant cross-appeals from the judgment on the jury's verdict.

■ The liability issue in this case is straightforward. Whether plaintiff was entitled to prevail essentially depended upon whether Frankman, the American Family agent, told her that her coverage for caesarean procedures would be based on the 80%/20% formula. Although Frankman denied that he had made any such statement, the jury resolved the matter against his version of the circumstances. We conclude that, under the substantive law of South Dakota which is applicable in this diversity case, plaintiff established a claim of misrepresentation of her insurance coverage by the defendant's agent. *See Aesoph v. Kusser,* 498 N.W.2d 654, 656 (S.D.1993); *Moore v. Kluthe & Lane Ins. Agency, Inc.,* 89 S.D. 419, 426–28, 234 N.W.2d 260, 264–65 (1975).

■ It is regrettable that so much of the trial and arguments on appeal were devoted to the alleged forgery of the waiver. As noted earlier, the terms of that endorsement had no application to the theory upon which plaintiff based her claims. She had no complications that resulted in a hospital stay exceeding a six-day period and, thus, incurred no expenses that would have been affected by the waiver. The issue of the alleged forgery of the waiver was simply not pertinent to the plaintiff's claims, and she had no basis for introducing evidence on that point.

The plaintiff's case depended on the jury finding her version of the events in this case more credible than that of Frankman, American Family's agent. No one at the company other than Frankman made any representations to plaintiff about her insurance coverage. For the forgery evidence to affect credibility, therefore, it had to be directed, not at

the company, but at Frankman—in other words, that the testimony tended to show that he had something to do with placing the plaintiff's signature on the waiver form.

Plaintiff's counsel conceded that there was no evidence against Frankman on that point. In arguing the claim of fraud before the district judge during trial, the plaintiff's counsel said:

"And, Judge, at no point have I ever said Mr. Frankman forged that signature. At no point have I said Mr. Frankman did this in 1991; I don't think he did. At no point have I said who forged this document because I don't know. But the only one that had control of it, the only one using it, the only one perpetuating by using that waiver is American Family Insurance Company, Judge. It can't be anybody else. Nobody else in the world cares."

Tr. at 497.

Counsel's candor was commendable in admitting that he did not know who committed the forgery and that he did not believe Frankman was responsible.[1] We likewise find no evidence in the record to impute culpability to Frankman. Moreover, Frankman had ceased being an agent for American Family in the fall of 1987, and the records of policies written by him remained at the insurance company's office. The plaintiff's claim did not arise until June 1988.

The company did not offer the waiver in evidence, and it was error for the district court to admit testimony about the alleged forgery. To allow the evidence to affect the credibility of the company as a whole was inappropriate when concededly the alleged forgery was not imputed to Frankman, the individual charged with misrepresentation. The issue is close, but in view of the trial judge's limiting instruction, we cannot say that the admission of the evidence constituted reversible error.

Aside from the forgery issue, however, the record is adequate to support the jury's finding that a misrepresentation had been made. Therefore, the company was liable for the 80% share of the hospital bill. The award for mental anguish, however, requires some discussion.

It is not clear under what legal theory plaintiff is pursuing in her claim for damages for mental suffering. The trial court and parties at times referred to breach of contract, but on other occasions treated the misrepresentation as a tort.

There is a substantial basis for characterizing the plaintiff's claim as one for breach of contract. In *Farmers Mut. Auto. Ins. Co. v. Bechard*, 80 S.D. 237, 248, 122 N.W.2d 86, 92 (1963), the Supreme Court of South Dakota held that an insurance company was estopped to deny representations by its agent as to the extent of coverage. Put another way, policyholders are free to claim those benefits to which they would have been entitled had the misrepresented coverages actually been part of the policy.

That theory seems to be a basis for the plaintiff's suit here—that because of the representations that Frankman made, the policy was amended de facto to provide a 80%/20% formula for payments for the caesarean procedure. This case, therefore, is primarily one for breach of contract in failing to provide those benefits.

The tort concept, however, was advanced at trial as well. In *Smith v. Weber*, 70 S.D. 232, 236–37, 16 N.W.2d 537, 539 (1944), the Supreme Court of South Dakota conceded that "an omission to perform a contract obligation is never a tort," but went on to conclude that the breach of a legal duty upon which a tort is based "may arise out of a relation or state of facts created by contract," and thus, "[w]hile the matters complained of ... [may have] had their origin in a contract, the gist of the action is for alleged wrongful and tortious acts of defendant." *See also Ducheneaux v. Miller*, 488 N.W.2d 902, 914–15 (S.D.1992) (deceit intended to induce plaintiff to enter into a contract was material to the contract). In the case at hand, it appears that plaintiff is asserting a combina-

---

1. Plaintiff's counsel changed his position, however, in the brief on appeal and now argues that the evidence suggests that Frankman forged the waiver. "If not Frankman, someone else within the American Family organization forged the waiver to deny coverage." Plaintiffs' Br. at 24. No record evidence is cited to support either statement.

tion of contractual and tort liability for the agent's misrepresentation.

■ As a general rule, damages for mental suffering are not recoverable for breach of contract, including misrepresentation claims. As Professor Dobbs emphasizes in his leading text on remedies,

"[f]raud, deceit and negligent misrepresentation are economic torts. Although the invasion of an economic interest by tort or by contract breach will often cause the plaintiff personal distress, the interest ordinarily protected in such cases is purely an economic interest and does not include interests in personality. Accordingly, the usual rule is that the plaintiff must show pecuniary loss in misrepresentation cases and the damages are limited to such pecuniary loss, with no recovery for emotional distress."

2 Dan B. Dobbs, *Law of Remedies* § 9.2(4), at 559–60 (2d ed. 1993) (footnote omitted). Under the Restatement view, the only damages recoverable for negligent misrepresentation are those necessary to compensate the plaintiff for pecuniary loss. *See Restatement (Second) of Torts* § 552B (1977). Section 549 of the Restatement similarly provides that victims of fraudulent misrepresentation are entitled to recover their pecuniary losses. *Id.* § 549.

There are some limited exceptions to the general ban on emotional distress damages in contract cases. For instance, recovery is permitted in cases of mishandling dead bodies, misdelivery of telephone and telegraph messages, improper refusal of service by a utility, or improper conduct by a common carrier or innkeeper. *Chisum v. Behrens*, 283 N.W.2d 235 (S.D.1979), is a demonstration of that class of cases. There, the claim was for the mishandling of a corpse. In discussing damages, the Supreme Court of South Dakota said,

"where the act is willful or malicious, as distinguished from being merely negligent, recovery may be had for mental pain, though no physical injury results.... The important elements seem to be that the act is intentional, that it is unreasonable, and that the actor should recognize it as likely to result in illness."

*Id.* at 240 (internal quotation omitted). The same standards were reiterated in *Tibke v. McDougall*, 479 N.W.2d 898, 906 n. 11 (S.D. 1992).

In some instances of fraud or misrepresentation, a plaintiff may recover damages for mental anguish because the defendant's conduct satisfies the elements of the tort of intentional infliction of emotional distress. That tort, however, has been circumscribed as a matter of public policy. In a series of cases over the years, the South Dakota Supreme Court has carefully scrutinized claims for the intentional infliction of emotional distress. *See Kjerstad v. Ravellette Publications, Inc.*, 517 N.W.2d 419, 429 (S.D.1994) ("extreme and outrageous conduct" required); *Tibke*, 479 N.W.2d at 906–07 (same). To relax the general rule against recovery for mental anguish in misrepresentation cases would create such a broad exception as to undermine the safeguards deemed necessary by public policy in the intentional infliction of emotional distress cases.

In *Kunkel v. United Sec. Ins. Co.*, 84 S.D. 116, 168 N.W.2d 723 (1969), an insured sued his liability carrier for bad faith refusal to settle a claim against him. As a result of the carrier's actions, the insured had been the subject of a garnishment and a body execution, and his credit had been destroyed. In one count for damages, he alleged "mental suffering" demonstrated by tension, lack of sleep, and nervousness requiring a doctor's prescription for tranquilizers. The South Dakota Supreme Court determined that there had been no loss of property or employment or other pecuniary loss and the record did not support an award for mental suffering. *Id.* at 136, 168 N.W.2d at 734. In *Champion v. United States Fidelity & Guar. Co.*, 399 N.W.2d 320, 322 (S.D.1987), the Supreme Court of South Dakota, in dictum, characterized the ruling in *Kunkel* on mental suffering damages as based on insufficiency of evidence and not on the lack of a cause of action.

■ Just what path the South Dakota Supreme Court would follow if presented with a claim for mental anguish damages as an element of a misrepresentation claim is not

clear. But the insistence upon stringent requirements for the recovery of damages for an injury of that nature in other tort cases leads us to conclude that South Dakota would not recognize such damages in circumstances similar to this case. The state supreme court's policy to limit the recovery of mental distress damages to a narrow set of circumstances in other tort cases is inconsistent with the likelihood that it would allow similar awards in misrepresentation cases.

We have surveyed the many cases in other jurisdictions bearing on the general subject and have found instances where, contrary to the general rule, recovery for mental distress has been allowed. There are, however, many other cases where it has been denied. *See, e.g.,* 3 Jacob A. Stein, *Stein's Personal Injury Damages Service* § 3:2:1 (1993). We do not catalog these many decisions because it would do little to resolve the issue.

██ We have found no indication that South Dakota law varies from the general rule limiting the recovery of mental distress damages. As a federal court, our role is to interpret state law in diversity cases and not to fashion it. We conclude, therefore, that in the circumstances of this case, there is no proper basis for the recovery of damages for mental suffering.

Even if we were convinced that mental distress is a proper item of damages, scrutiny of the damage evidence under the standards used by the South Dakota Supreme Court in the *Kunkel* case reveals deficiencies in the plaintiff's proof. In *Kunkel,* the court noted that "a nearness in the sequence of events and a closeness of cause and effect must exist so that the injurious act predominates over other probable causes to produce the consequential damage before recovery will be permitted." *Kunkel,* 84 S.D. at 135, 168 N.W.2d at 734.

It is helpful to analyze the testimony to put the issue of mental anguish damages in context. To begin, we note once again that the form policy—seemingly, the one that Frankman discussed with plaintiff—did provide for a 80%/20% payment of benefits in the event that a caesarean resulted in a hospital stay that exceeded six days. Therefore, before the underwriting department had prepared its waiver and sent it to Frankman to for-

ward to plaintiff, he probably was under the impression that the 80%/20% provision would be applicable in a policy that would be issued to plaintiff.

Only after the underwriters decided to issue a policy in March 1987 with a waiver deleting the 80%/20% feature would Frankman have been aware of that limitation. Plaintiff testified, however, that she never saw Frankman after she had completed the application on January 30, 1987. According to the plaintiff's version of the events, she never talked with the agent after the 80%/20% provision was no longer part of the form policy. Consequently, Frankman's misrepresentations must have been made before or at the time the application was prepared in January 1987 and before the deletion had been made by the underwriters.

The plaintiff's husband testified that when he first asked Frankman if the American Family policy would cover caesareans, Frankman replied that "he didn't see that it would be any problem because their C-section deliveries would be just like any surgery; appendectomy or anything." Also, when Frankman was at the plaintiff's home on January 30, 1987 and was asked about coverage for caesareans, he responded that it would be 80%/20% like any major medical problem. The plaintiff's husband never spoke to Frankman after that occasion.

Plaintiff similarly testified that when Frankman came to her home to prepare the application, he was asked if the insurance would cover a caesarean delivery birth. He answered that it would be "considered to be a major medical operation. He used the example that it would be covered just like an appendectomy.... The American Family Company would pay 80 percent, we would pay 20 percent, plus $100 deductible."

When asked by her counsel if there was "ever any mention by the American Family agent that there was a limit of $500 for C-section," plaintiff answered, "[n]o, there was not." As to future caesareans, she "was of the understanding they would be covered. They were 80 percent covered."

The testimony of plaintiff and her husband does not rule out the possibility that the agent's representations were simply negligent, were based on confusion, or were addressed to the problem of complications arising from a caesarean where an 80%/20% payment plan would have been applicable, absent a waiver. In context, the agent's statements were neither outrageous nor intended to defraud plaintiff. In fact, plaintiff did get coverage for the caesarean procedure, although the amount was less than allegedly had been promised to her.

A brief summary of the damage evidence, particularly that of the documentary variety, is also significant in this case. The plaintiff's obstetrician-gynecologist testified from his records that she had told him about the problem with the insurance coverage for the caesarean at office visits on April 10, 1989, May 21, 1990, and July 11, 1991, all some periods of time after the insurance company denied liability for more than $500 in August of 1988. The doctor's notes revealed that plaintiff discussed no other source of financial difficulty. The doctor opined that "the financial problems that her and the family have faced have been a significant part of her depression." The doctor conceded, however, that during the period where the plaintiff's depression was most acute, he was also prescribing hormone therapy for a premature menopause condition.

Apparently unknown to the doctor were other significant problems that had confronted the family beginning in 1989. A tenant in a trailer they had purchased had to be evicted for nonpayment of rent. The new baby developed a staph infection in July of 1989 requiring four days of hospitalization, an expense that was apparently not covered by any insurance. A notation in the plaintiff's diary in February 1991 refers to calls from bill collectors: "[I]t's either Sears, Visa, Greentree [collector for back taxes on the trailer] or my student loan—they want their money." Her experience is the not uncommon one of a struggling young family enduring a period of financial hardships.

The first time that plaintiff told her doctor of her financial stress arising from the insurance company's action in denying full coverage was eight months after the $500 payment was made to the hospital. At that same office visit, moreover, plaintiff commented on her problems in coping with her five-year-old son. It was more than a year later when she saw the doctor again. At trial, plaintiff testified that things started to go wrong in January 1989, some five months after the company denied payment under the 80%/20% formula. Closeness of time and effect are lacking.

In short, the causation of damages is even more tenuous than it was in *Kunkel*. The closeness of time and effect required by that case are lacking here. Moreover, the alleged misrepresentation was not of the egregious or aggravated nature described in cases where mental anguish damages have been allowed. We thus hold that, in this case, the submission of the claim for mental anguish to the jury was not supported by law or the facts, and therefore, the verdict to that extent cannot stand.

Nor does the record support the plaintiff's claims for intentional infliction of emotional distress, punitive damages, and attorneys' fees. We agree with the district court's conclusion that "there was no credible evidence upon which a reasonable belief could be formed that the defendant was guilty of willful, wanton, or malicious conduct." The district court, therefore, properly dismissed those counts.

As indicated earlier, however, the claim for misrepresentation would allow the plaintiff to secure the coverage she thought she had received for the surgical procedure. Therefore, the district court should enter judgment for plaintiff in the amount of $3,174.48—80% of the hospital expenses minus the $500 already paid—to cure that defect.

Accordingly, the judgment of the District Court will be reversed, and the matter will be remanded with instructions to enter a judgment in favor of plaintiff in the amount of $3,174.48.