Kathryn Lynn KOOYMAN, A Minor; by D. Frank Kooyman, Her Conservator and Father and Next Friend; D. Frank Kooyman, Individually; and Jane Kooyman, Appellants,

v.

FARM BUREAU MUTUAL INSURANCE COMPANY, Appellee.

No. 65420.

Supreme Court of Iowa.

Jan. 20, 1982.

Rehearing Denied Feb. 18, 1982.

Paul E. Huscher & Paul R. Huscher, Des Moines, for appellee.

Thomas D. Hanson and Richard Pundt of Blanchard, Cless & Hanson, Des Moines, for appellants.

Considered by LeGRAND, P. J., and HARRIS, McCORMICK, McGIVERIN and LARSON, JJ.

LARSON, Justice.

The plaintiff Kathryn Kooyman was severely injured by a car while crossing a Des Moines street to board a school bus. Suit was filed on her behalf by her father, and by her parents individually, naming as defendants Wilmer J. Van Wyk, driver of the car, the Des Moines Independent School District, owner of the bus, and John Brown, its driver. Early in the trial the school district and its bus driver settled with the Kooymans and the case proceeded against Van Wyk alone. Van Wyk's defense was provided by the defendant here, Farm Bureau Mutual Insurance Company. A verdict was rendered for $1,100,000 and, after the settlement with the school and bus driver was deducted, a balance of $600,000 was entered as a judgment against Van Wyk. Execution on the judgment was returned unsatisfied. Van Wyk and the Kooymans then entered into a settlement agreement under which Van Wyk assigned to the Kooymans his potential claim against Farm Bureau for its allegedly improper handling of his defense. Thereafter, the Kooymans filed the present "excess judgment" action against Farm Bureau, alleging bad faith and negligence in its representation of Van Wyk. The district court dismissed the case on Farm Bureau's motion that the Kooymans' had failed to state a cause of action. See Iowa R.Civ.P. 104(b). On appeal to this court, we reversed the dismissal of the claim of bad faith but affirmed the dismissal of the claim of negligence. *Kooyman v. Farm Bureau Mutual Insurance Company*, 267 N.W.2d 403 (Iowa 1978). Following remand, the case was tried on the issue of bad faith, and after presentation of the Kooymans' evidence, the district court sustained a motion for directed verdict. On appeal the Kooymans contend the district court erred in granting the motion for directed verdict, and in sustaining the objections to their expert testimony. We affirm one of the evidentiary rulings, reverse the other, and reverse the granting of the directed verdict.

■ Van Wyk's Farm Bureau policy included this provision:

The Company will defend any lawsuit, even if groundless, false or fraudulent, seeking damages which are payable under the terms of this policy, but the Company may make such investigation and settlement of any claims or lawsuit as it deems expedient.

The provision, which is standard in such policies, gives the insurer control over the settlement and trial, at least to the extent

of its policy coverage. It also requires the insurer to pay for the defense of any suit, regardless of the size of the claim or of the expected recovery. *See* 7C J. Appleman, *Insurance Law & Practice* § 4712, at 476 (1979); 45 C.J.S. *Insurance* § 933, at 1060 (1966) ("It is [the] insurer's duty to conduct the whole defense, regardless of the amount involved, whether it exceeds or does not exceed insurer's liability, and to protect insured as well as itself against liability at all stages of the litigation . . . ."). The power to control the defense has a concomitant duty to give proper consideration to the interests of the insured, and failure to do so may be an element of bad faith in a suit against the insurer. *Henke v. Iowa Home Mutual Casualty Co.*, 250 Iowa 1123, 1130, 97 N.W.2d 168, 173 (1959). A covenant is implied in an insurance contract that neither party will do anything to injure the rights of the other in receiving the benefits of the agreement. This covenant includes a duty to settle claims without litigation in appropriate cases. 7C Appleman, *supra* § 4712, at 446; *see* Keeton, *Liability Insurance and Responsibility for Settlement*, 67 Harv.L.Rev. 1136, 1137–38 (1954) (responsibility of insurer for exercise of power to control defense implicit in policy); *see also Neal v. Farmers Insurance Exchange*, 21 Cal.3d 910, 920–21, 582 P.2d 980, 985, 148 Cal.Rptr. 389, 395 (1978) (implied covenant discussed).

The general rule is that an insurer will be liable for its acts in representing an insured only if "bad faith" is established, although some cases have adopted a negligence standard. Most seem to combine the concepts:

Some courts, in weighing the responsibilities of the liability insurer, speak of bad faith; some speak of negligence; others use the two terms interchangeably. And, in truth, they are to some extent interchangeable. The insurer, as a professional defender of lawsuits, is held to a standard higher than that of an unskilled practitioner. What might be ignorance in one instance may be unforgivable oversight of the insurer; what might be neglect in one instance could well constitute bad faith on the part of the insurer. The question is always: "Did the insurer exercise that degree of skill, judgment, and consideration for the welfare of the insured which it, as a skilled professional defender of lawsuits having sole charge of the investigation, settlement, and trial of the suit may have been expected to utilize?" If it did, there is no problem; it is not liable. If it did not, then a court could easily describe its conduct as being negligent, or as not in accordance with the high duty of good faith which it owed to its insured. And the insured, having surrendered to the insurer the exclusive control over these matters which impinge so closely upon his future welfare and financial well-being, is entitled to expect that skill, that judgment, and that consideration to which reference has been made.

7C Appleman, *supra* § 4712, at 425–26. Other authorities agree that any distinction between the negligence and bad-faith concepts is virtually obliterated by admitting evidence of negligence on the issue of bad faith. Keeton, *supra* at 1140; Annot., *Duty of Liability Insurer to Settle or Compromise*, 40 A.L.R.2d 168, 171 (1955); *see Brown v. United States Fidelity & Guaranty Co.*, 314 F.2d 675, 677 (2d Cir. 1963).

The general rule that evidence of negligence is admissible on the issue of bad faith has been modified in Iowa so that only evidence of negligence which shows an indifference to or disregard of the interests of the insured may be considered. *Kohlstedt v. Farm Bureau Mutual Insurance Co.*, 258 Iowa 337, 339, 139 N.W.2d 184, 185 (1965); *Ferris v. Employers Mutual Casualty Co.*, 255 Iowa 511, 516, 122 N.W.2d 263, 266 (1963). *See generally* 7C Appleman, *supra* § 4712, at 432–447 (factors involved in bad faith); Annot., 40 A.L.R.2d *supra* at 171.

The Kooymans contend there was sufficient proof of Farm Bureau's negligence to submit the issue of bad faith to the jury. Evidence was presented from which the jury could conclude it was obvious to all of the attorneys involved that a verdict would be rendered far in excess of Van Wyk's policy limits of $25,000. The Kooymans

claim that despite the probability of a large excess verdict, the preparation for the trial by Farm Bureau's attorneys was minimal and that they did not pursue settlement negotiations with the insured's interests in mind, indicating its lack of good faith.

Farm Bureau contends that bad faith is a "species of fraud," and that the evidence here was insufficient as a matter of law. However, good faith or bad faith in this context does not connote the absence or presence of positive misconduct of a malicious, illegal, or immoral nature such as would be required for punitive damages; rather, it refers to a breach of the implied covenant of good faith. *See Neal v. Farmers Insurance Exchange*, 21 Cal.3d at 921–22 n.5, 582 P.2d at 986 n.5, 148 Cal.Rptr. at 395 n.5.

> The phrase 'good faith' is used in a variety of contexts, and its meaning varies somewhat with the context. Good faith performance or enforcement of a contract emphasizes faithfulness to an agreed common purpose and consistency with the justified expectations of the other party; it excludes a variety of types of conduct characterized [in other contexts] as involving 'bad faith' because they violate community standards of decency, fairness or reasonableness.

*Restatement (Second) of Contracts* § 205, comment a (1981). "Bad faith" under the circumstances of this case refers simply to the absence of good faith required by the implied contract. *See* 7C Appleman, *supra* § 4712, at 439.

### I. *The Directed Verdict Ruling.*

In ruling on a motion for directed verdict, the evidence must be viewed in the light most favorable to the party against whom the motion was made, regardless of whether it was contradicted; moreover, a court must draw every legitimate inference in aid of the evidence. If reasonable minds could differ on the issue, it should be submitted to the jury. *See* Iowa R.App.P. 14(f)(2), (17); *Larsen v. United Federal Savings & Loan Association*, 300 N.W.2d 281, 283 (Iowa 1981); *Beitz v. Horak*, 271

N.W.2d 755, 757 (Iowa 1978); *Curran Hydraulic Corporation v. National-Ben Franklin Insurance Company*, 261 N.W.2d 822, 823 (Iowa 1978).

We set out the evidence of bad faith in the light most favorable to the Kooymans. This evidence showed that the verdict was expected to be very high: one of Farm Bureau's attorneys expected it would be around $800,000 and his co-counsel expected it to be $1,000,000 to $1,200,000. One of the attorneys representing the school district valued it at $500,000 to $1,000,000; another of its attorneys valued it at over $1,000,000 and testified that upon his investigation he "could see no way [the insured] would not be held liable." Farm Bureau's own claims manager testified he felt it would be "very unlikely that [its] insured would be exonerated." And its assistant general counsel testified, "[w]e knew our twenty-five thousand was certainly gone, and how much above is anybody's good guess."

There was considerable basis for this pessimism: pre-trial investigation had revealed that Van Wyk passed a line of cars stopped behind a school bus, which had its warning lights blinking, and struck Kathryn Kooyman, leaving her a paraplegic. The potential for a very large verdict was apparent. Yet from the standpoint of representing its own financial interests Farm Bureau had little to gain, or lose, regardless of the outcome of the litigation. It could not reasonably hope to salvage any of its coverage; its $25,000 limit was already "gone." Such circumstances no doubt prompted one commentator to note that "where the insurer recognizes the probability that an adverse verdict will exceed policy limits, the boundaries of 'good faith' become compressed in favor of the insured." 7C Appleman, *supra* § 4712, at 443.

In assessing good faith in such circumstances, the test is whether the insurer has approached the matter of settlement as if there were no policy limits: "when it does so, it views the claim objectively and renders equal consideration to the interests of itself and of the insured." *Koppie v. Allied Mutual Insurance Co.*, 210 N.W.2d

844, 848 (Iowa 1973); *accord, Brown v. United States Fidelity and Guaranty Co.,* 314 F.2d at 678; 7C Appleman, *supra* § 4712, at 451 ("the test is whether a prudent insurer without policy limits would have accepted the settlement offer"); Keeton, *supra* at 1148 ("With respect to the decision whether to settle or try the case, the insurance company must in good faith view the situation as it would if there were no policy limit applicable to the claim.").

The Kooymans argue that there was evidence from which the jury could conclude Farm Bureau failed this test of good faith, that it gave Van Wyk representation only commensurate with its financially-detached interest in the case and not that which it would have provided if its policy coverage were unlimited.

A. *Investigation and trial preparation.* The Kooymans argue that Farm Bureau's investigation and preparation for trial was so defective it evidenced an indifference to its insured's interests. Farm Bureau's attorneys took only one witness statement, that of its own driver, despite the fact several children on the bus and others were known to have witnessed the accident, and despite the advice of its own claims manual that "[g]ood statements are an absolute necessity to claim examiners and defense attorneys and should be the aim of every conscientious investigator." Although the attorneys for Farm Bureau attended depositions arranged by other attorneys, they made no arrangements for their own. When requested by another defendant to contribute to the deposition of a urologist, its attorneys refused saying it would not have requested the deposition on its own, despite the fact the urologist's testimony was critical on the issue of prognosis. When the other defendants settled with the Kooymans on the second day of trial, Farm Bureau's attorney moved for a continuance and for a mistrial. Farm Bureau contends a continuance was necessary because the loss of the two defendants required a change in trial strategy; however, a jury could infer that Farm Bureau had been relying upon the lawyers for the other defendants and that the delay was requested

in order for its attorneys' preparation to handle the laboring oar suddenly handed to them. Some lack of preparation was further evidenced by the fact that its attorneys, apparently not having adequately interviewed two of its witnesses in advance, inadvertently elicited very damaging testimony from them at trial.

More than an error in judgment is required to establish bad faith, and it is said that an insurer cannot be required to predict with certainty the result of a closely contested claim. 7C Appleman, *supra* § 4712, at 436; *see Henke v. Iowa Home Mutual Casualty Co.,* 250 Iowa at 1129–30, 97 N.W.2d at 173. Nevertheless, indifference of an insurer evidenced by a failure to adequately investigate a case will support a finding of bad faith. *See Kohlstedt v. Farm Bureau Mutual Insurance Co.,* 258 Iowa at 339–40, 139 N.W.2d at 185; *Ferris v. Employers Mutual Casualty Company,* 255 Iowa at 516, 122 N.W.2d at 266; *Henke v. Iowa Home Mutual Casualty Co.,* 250 Iowa at 1131, 97 N.W.2d at 174; 7C Appleman, *supra* § 4712, at 432, 470, 480; Annot., 40 A.L.R.2d *supra* at 171. Under some circumstances an insurer's failure to investigate properly may alone establish bad faith, 7C Appleman, *supra* at 480; however, we consider this evidence along with all the other in determining whether a jury issue of bad faith was presented, *see Brown v. United States Fidelity and Guaranty Co.,* 314 F.2d at 682; *Henke v. Iowa Home Mutual Casualty Co.,* 250 Iowa at 1131, 97 N.W.2d at 179 (failure to properly investigate "will have an influence on the issue of bad faith"); 7C Appleman, *supra* § 4712, at 432–33 (lack of proper investigation considered with other factors in assessing bad faith).

B. *Failure to negotiate in good faith.* Before the school district and its driver settled their part of the case, the Kooymans had demanded $125,000 from Van Wyk and Farm Bureau. Van Wyk had been informed of that demand and had refused to contribute the $100,000 above the policy limits to meet it. The school district,

however, on settling its part of the case, offered to pay an additional $25,000 toward Van Wyk's liability if the whole case could be "wrapped up." This would have reduced Van Wyk's contribution to $75,000 and would have been within his means to pay. There was considerable evidence, however, that this offer of settlement was never conveyed to Van Wyk, who testified that the last offer would require payment of $100,000 by him individually. Failure of an insurer to advise its insured of the status of settlement negotiations is indicative of indifference and thus of bad faith. *Henke v. Iowa Home Mutual Casualty Co.*, 250 Iowa at 1131–32, 97 N.W.2d at 179; 7C Appleman, *supra* § 4712, at 432, 444, 470, *487* ("It is not sufficient to merely be in contact with the insured; the insurer "must be careful to give its insured full and accurate information as to settlement possibilities."); Annot., 40 A.L.R.2d *supra* at 216 (failure to advise insured of compromise offer as evidence of bad faith).

Closely related to the duty to advise an insured of the possibility of settlement is the duty to inform him of the expected consequences of his failure to settle. There was evidence here that while Van Wyk had been advised the verdict would likely be "around $800,000," he was apparently never advised of the consequences to him personally if a verdict of that size was returned by the jury, or if the other parties would settle their part of the case (which they ultimately did) and the trial would proceed against him alone. He was never advised that a verdict of the expected size would wipe him out financially. It is conceivable, and a jury could so find, that if he had been advised of these matters he would have accepted the claimant's last offer of settlement and salvaged some of his net worth. As it developed, the judgment exceeded his net worth by about $500,000. Failure to advise of the probable *effects* of such excess liability may be indicative of bad faith. *Henke v. Iowa Home Mutual Casualty Co.*, 250 Iowa at 1131–32, 97 N.W.2d at 179. In *Lange v. Fidelity & Casualty Co.*, 290 Minn. 61, 185 N.W.2d 881, 885–86 (1971), it was similarly stated:

Defendant [insurer] contends its obligation was fulfilled by keeping the insured fully informed of the negotiations with Duffy [the adverse party]. We feel that it was incumbent upon defendant to advise the insured that he would be exposed to an excess judgment of $4,000 if Duffy's offer of $25,000 were not accepted. Defendant was obliged to advise him *in detail* as to the implications of an excess verdict.

This obligation of counsel retained by the insurer is not fulfilled merely by an explanation which amounts to no more than assurances to the insured that his interests are being zealously and faithfully protected by experienced counsel, but rather by laying bare the truth—not only of the potential consequences of a deficiency judgment but of the potential conflict between the interests of the carrier and the insured—in the manner in which the insured would be advised if he consulted private counsel.

*See also* 7C Appleman, *supra* § 4712, at 444, 478 (insurer "must investigate the total claim properly and keep the insured reasonably well informed of the progress of the case, including settlement offers, and must explore the insured's capability to contribute to the settlement."; and an insurer, "after making its evaluation [of financial exposure] must inform the insured *in detail* of the potential consequences of a deficiency judgment and of the conflict between itself and the insured.") (Emphasis added.)

 When the Kooymans' last offer to accept $100,000 was conveyed by Kooymans' attorney, one of Farm Bureau's attorneys (not counsel on appeal) responded "kiss my ___," and added that the previous offer to pay $60,000 ($25,000 by Farm Bureau and $35,000 by the insured) would be withdrawn if not accepted in seven days. The Kooymans contend this exchange chilled future settlement negotiations and amounted to a withdrawal of the policy limits. (More than seven days elapsed between this exchange and the return of the verdict.) While attorneys are trained to maintain an adversary position,

the balancing of interests between the insurer and insured frequently requires an attitude of conciliation rather than ultimate trial. 7C Appleman, *supra* § 4712, at 483. *See id.* at 451 ("An insurer's flat refusal to negotiate, under circumstances of substantial exposure to liability, a demonstrated receptive climate for settlement, and limited insurance coverage, may show lack of good faith."); *id.* at 453 ("The good faith of the insurer is determined by asking whether insurer considered the reasonable valuation of the case, and whether proposed settlements were rejected consciously in terms of deliberative judgment evaluation or because of other or no reasons.") The jury could conclude that Farm Bureau's attorneys acted out of contentiousness or indifference in the settlement proceedings and thus had breached its implied covenant of good faith.

█ We believe the cumulative evidence submitted by the Kooymans was sufficient to generate a jury issue. When it is viewed in the light most favorable to the Kooymans, a jury could find Farm Bureau had approached the preparation and trial with indifference, especially in view of the great amount of its insured's money at stake. Iowa R.App.P. 14(f)(10) (only in "exceptional cases" may questions of negligence be decided as matters of law). A jury could also conclude Farm Bureau had not pursued settlement negotiations with the same intensity, interest, and good faith it would have if there had been no policy limits. *Koppie v. Allied Mutual Insurance Co.*, 210 N.W.2d at 844. If so, a finding of bad faith would be warranted on that ground as well. Under this record it was error to direct a verdict for Farm Bureau.

II. *Rulings on Expert Testimony.*

█ The Kooymans' attorneys attempted to introduce an opinion by the attorney who had represented them in the trial against Van Wyk that Farm Bureau's attorneys had acted in bad faith. The district court sustained an objection to the testimony. Bad faith is the standard by which Farm Bureau's liability must be

measured; a witness may not give an opinion whether it did or did not meet that standard. *Grismore v. Consolidated Products Co.*, 232 Iowa 328, 361, 5 N.W.2d 646, 663 (1942). It is not a proper subject of expert testimony, *Schlichte v. Franklin Troy Trucks*, 265 N.W.2d 725, 730 (Iowa 1978), and the district court properly refused it. There was also an opinion proffered by the attorney who had represented the school district that "I don't believe ... [Farm Bureau's] was a sufficient investigation." An objection to the opinion was sustained by the court as "giving the ultimate answer to the question of whether or not this was negligence or bad faith." The objection was properly sustained; an opinion that there was not "a sufficient investigation" is in effect an opinion that the attorney's actions did not meet the requisite standard of care and is therefore inadmissible. *See Grismore v. Consolidated Products Co.*, 232 Iowa at 344–45, 5 N.W.2d at 654.

The case is reversed on the ruling on the motion for directed verdict.

REVERSED AND REMANDED.