Merlin **HELMBOLT**, Ardis Olson and Eben Olson, Plaintiffs and Appellees,

v.

**LeMARS MUTUAL INSURANCE COMPANY, INC.**, Defendant and Appellant.

Nos. 15290, 15292.

Supreme Court of South Dakota.

Argued Oct. 22, 1986.

Decided April 15, 1987.

David V. Vrooman, Sioux Falls, for plaintiffs and appellees.

Timothy J. McGreevy of Moore, Rasmussen, Kading & McGreevy, Sioux Falls, for defendant and appellant.

MILLER, Circuit Judge.

This is an appeal from a judgment entered on a jury verdict which awarded appellees Ardis and Eben Olson (Olsons) damages against appellant LeMars Insurance Company (LeMars) in an action for failure to attempt to make a good faith settlement of a claim within policy limits. We affirm in part and reverse in part.

## FACTS

In February 1981, an automobile driven by Merlin Helmbolt (Helmbolt) crossed the center line and collided with a vehicle driven by Ardis Olson, causing her severe personal injuries. At the time of the accident, both Helmbolt and Olson carried automobile insurance policies with LeMars. Helmbolt's policy provided $50,000 in liability coverage per accident. The policy covering Ardis and her husband Eben included $100,000 of underinsured motorist coverage[1] which required LeMars to pay the difference between the insurance available through the policy of the negligent party, and $100,000. That amount in this case equaled $50,000.

Olsons commenced suit against Helmbolt in Deuel County, South Dakota. Ardis sought damages for pain and suffering, personal injuries, lost income, and other losses. Eben sought damages for loss of consortium. It became clear during the discovery phase that Helmbolt had negligently caused the accident. In addition to being on the wrong side of the road, he was driving while under the influence of alcohol. Prior to trial, Olsons' counsel, Mi-

chael Pieplow, vigorously attempted to settle the case for $100,000. This represented the $50,000 limit of Helmbolt's policy and the additional $50,000 available through Olsons' underinsurance coverage. LeMars refused to offer more than $50,000 without a waiver of Olsons' rights under their underinsurance provision, claiming nothing had to be paid on Olsons' policy until a judgment in excess of $50,000 was entered against Helmbolt.

At this initial trial, Helmbolt was represented by LeMars' attorney and also by private counsel for the excess claim. Helmbolt admitted liability and the case was submitted to the jury solely on the issue of damages. The Deuel County jury awarded a $160,000 judgment ($150,000 for Ardis and $10,000 for Eben) in favor of Olsons and against Helmbolt. The court also imposed costs of $1,239.70 against Helmbolt. Soon thereafter, LeMars paid Olsons $50,000 on Helmbolt's policy, $50,000 on Olsons' policy, and the costs, for a total of $101,239.70. This left a balance due of $60,000 on the judgment. LeMars requested a $100,000 partial satisfaction of judgment be filed in favor of Helmbolt, and Olson's attorney complied.

Sometime subsequent to this initial trial, Helmbolt agreed to pay Olsons $4,500, and to assign Olsons his bad faith claim against LeMars. In return, Olsons gave Helmbolt a complete satisfaction of judgment. Olsons therefore received all but $55,500 of the judgment rendered in Deuel County prior to bringing the present suit against LeMars.

In February, 1985, Olsons began this current action against LeMars on behalf of themselves and as assignee of Helmbolt. They alleged that throughout the suit against Helmbolt, LeMars failed to negotiate in good faith within the policy limits. They sought $60,000 actual damages, $100,000 punitive damages, attorney's fees, interest, and costs. LeMars denied the claim and counterclaimed against Helmbolt, claiming the right to collect $50,000 of the judgment entered in favor of Olsons

1. Underinsurance coverage is mandatory in all   automobile liability policies. SDCL 58–11–9.4.

and against Helmbolt. LeMars asserted this right through subrogation to Olsons' rights, by virtue of the $50,000 payment LeMars made to Olsons under the underinsurance provision of the LeMars/Olson policy. *See* SDCL 58-11-9.6. LeMars further asserted that since Helmbolt had assigned his claim to Olsons, Olsons were now subject to the $50,000 counterclaim, and any recovery by Olsons must be offset by that amount.

Prior to the bad faith trial, Olsons filed a motion for summary judgment on LeMars' counterclaim, alleging that the partial satisfaction of judgment filed in favor of Helmbolt included the $50,000 in which LeMars now claimed a subrogation right. The trial court denied the motion and ruled that the $50,000 claim was viable against Helmbolt. LeMars was therefore allowed to modify the partial satisfaction to reflect that the portion of the judgment claimed by subrogation was unsatisfied. Olsons then filed an amended complaint, which separated their claims from those assigned by Helmbolt. No amended answer or counterclaim was filed by LeMars. ·

The trial court hearing the claim against LeMars directed out the Helmbolt derived claim at the close of Olsons' case. This left only Olsons' claim for bad faith failure to settle within the limits of the underinsurance policy. The jury returned a verdict in favor of Olsons and against LeMars in the amount of $55,500.

## DECISIONS

The principal issue for us to determine is whether LeMars acted in bad faith by not attempting to settle within the combined policy limits of its two insureds.

We have in the past addressed the issue whether an insurer acted in bad faith by not settling within policy limits. *Crabb v. National Indemnity Company,* 87 S.D. 222, 205 N.W.2d 633; 63 A.L.R.3d 715 (1973); *Kunkel v. United Security Ins. Co. of New Jersey,* 84 S.D. 116, 168 N.W.2d 723 (1969). This case, however, presents unique circumstances in that both the negligent party and his victims are covered by the same insurance company.

We begin with the premise that a duty to act or deal in good faith is found in all insurance contracts. "A covenant is implied in an insurance contract that neither party will do anything to injure the rights of the other in receiving the benefits of the agreement. This covenant includes a duty to settle claims without litigation in appropriate cases." *Kooyman v. Farm Bureau Mut. Ins. Co.,* 315 N.W.2d 30 (Iowa 1982) (citing 7C J.A. Appleman, Insurance Law and Practice, § 4712 (1976); Keeton, *Liability Insurance and Responsibility for Settlement,* 67 Harv.L.Rev. 1136, 1137–38 (1954); *Neal v. Farmers Ins. Exchange,* 21 Cal.3d 910, 148 Cal.Rptr. 389, 582 P.2d 980 (1978)). It is settled that a finding of bad faith may be warranted on the grounds that an insurance company did not pursue settlement negotiations with the same intensity, interest and good faith ·it would have if there were no policy limits. *Crabb, Kunkel, Kooyman, supra.*

As we previously indicated in *Kunkel,* there is an array of factors to consider in determining whether an insurer's refusal to settle is equivalent to a breach of its good faith duty. These factors include: (1) the strength of the injured claimant's case on the issues of liability and damages; (2) attempts by the insurer to induce the insured to contribute to a settlement; (3) failure of the insurer to properly investigate the circumstances so as to ascertain the evidence against the insured; (4) the insurer's rejection of advice of its own attorney or agent; (5) failure of the insurer to inform the insured of a compromise offer; (6) the amount of financial risk to which each party is exposed in the event of a refusal to settle; (7) the fault of the insured in inducing the insurer's rejection of the compromise offer by misleading it as to the facts; and (8) any other factors tending to establish or negate bad faith on the part of the insurer.

84 S.D. at 123, 168 N.W.2d at 727.

In considering the foregoing factors, together with the overwhelming evidence contained in the record, and viewing this evidence in the light most favorable to the

verdict,[2] it is most easy to sustain the judgment below. Clearly Helmbolt was liable to Olsons for damages—this was really never in dispute. Furthermore, the medical testimony regarding Ardis' injuries and the evidence of medical expenses and loss of income was unrebutted. This unrebutted evidence included: (1) Ardis was severely injured by a drunk driver negligently operating a motor vehicle; (2) Ardis was without negligence; (3) Ardis' orthopedic surgeon diagnosed her as having a 27.5% permanent partial disability; (4) medical bills exceeded $18,000; (5) an expert witness projected a $115,000 loss of future income. Also, loss of consortium was not seriously disclaimed and liability was conceded. Finally, LeMars knew that Helmbolt would not have the finances to cover an excess judgment. *See Crabb*, 205 N.W.2d at 638.

In addition to the above evidence introduced in the suit against Helmbolt, there was other proof of LeMars' lack of good faith. Olsons' counsel testified that he evaluated the case in excess of $100,000 and so advised LeMars. Documents written for LeMars' internal use indicated the company itself evaluated the case to be worth $60,000 to $80,000. LeMars, in spite of its internal investigation and evaluation of the case, merely offered to settle for $50,000, conditioned upon a release of Olsons' underinsured claim. Olsons' counsel, Mr. Pieplow, responded by letter to LeMars' proposition, stating, among other things:

> This is to acknowledge receipt of your letter ... wherein you again concede the Helmbolt limits, but refuse to pay them over on the ground that it would not be fair to 'our insured or our company[.'] It appears to me that such a decision has adverse consequences to both of your insureds: Mr. Helmbolt, because he will now be sued for excess damages and a claim for punitive damages; the Olsons, because they are now subjected to the risks and uncertainties of litigation for limits you have conceded. Thus, it appears that the only beneficiary of the

refusal to pay at this time is LeMars Mutual. That benefit arises from the company's being able to retain and use the money. If that were paid to the Olsons at the present time, they could make 15% interest which they will now be losing and the company will be saving.... [Y]ou would have put us in the Catch–22 position of refusing to pay the underinsured persons limits by settlement, although you concede those limits, and then you refuse to make any payment under the terms of the Olson policy because the Helmbolt limits have not been exhausted. This appears to be evidence of bad faith on the part of LeMars, in that it is an effective refusal of a demand for policy limits, it is a refusal to negotiate, and it requires litigation between two of your insureds for the sole benefit of the company.

The record contains subsequent pretrial correspondence between the parties, with Olsons' counsel continuing to demand $100,000 and LeMars refusing to offer more than $50,000, in spite of the uncontroverted liability and damages evidence.

We agree with the observations of Olsons' counsel. There was ample evidence of LeMars' bad faith and violation of its fiduciary relationship to *one or both* of its insureds. "Equal consideration" was not given to the interests of these insureds. Due to LeMars' conduct, Olsons were forced to endure the rigors and uncertainties of trial, and Helmbolt faced potential personal responsibility for an excess judgment—which in fact occurred. It seems clear LeMars ignored its duty of good faith for the purpose of protecting its own interest. It also seems readily apparent to this court that the conduct of LeMars prior to the suit against Helmbolt was nothing more than gamesmanship. To allow a company to take the posture LeMars assumed would, at best, violate the public policy of this state, not to mention the settled law which requires an insurance company to settle and negotiate in good faith. Furthermore, LeMars' conduct in this case was tantamount to a unilateral revocation or

---

**2.** *See, e.g., Kostel Funeral Home, Inc. v. Duke*     *Tufty Co.*, 393 N.W.2d 449 (S.D.1986).

termination of mandatory coverage. On its face, that is conduct in bad faith.

LeMars argues that under SDCL 58–11–9.5 and –9.6 it had no duty to offer Olsons their underinsured motorist coverage prior to the entry of a judgment against Helmbolt. LeMars asserts its refusal to make such an offer therefore was in good faith. At the time Olsons purchased their policy, SDCL 58–11–9.5 provided: [3]

Subject to the terms and conditions of such underinsured motorist coverage, the insurance company agrees to pay its own insured for uncompensated damages as he *may* recover on account of an automobile accident because the judgment recovered against the owner of the other vehicle exceeds the policy limits thereon. Coverage shall·be limited to the difference of the policy limits on the vehicle of the party recovering or such smaller limits as he may select less the amount paid by the liability insurer of the party recovered against. (Emphasis added.)

SDCL 58–11–9.6 provides:

The issuer of the underinsured motorist coverage shall be subrogated to any amounts it so pays, and upon payment shall have an assignment of the judgment against the other party to the extent of the money it pays.

▮ Nothing in the above statutes requires an insured to reduce a claim against a tort-feasor to judgment prior to payment of underinsurance benefits. SDCL 58–11–9.5 employs the permissive word "may" rather than the mandatory word "shall." Thus, the avenue for settlement of these cases out of court is an open street. Chapter 58–11 of our code was not adopted to lessen the protection intended by requiring the purchase of underinsured motorist coverage. Had the legislature intended to require a judgment prior to payment of underinsured coverage, it would have and could have said so. In interpreting legislation, this court cannot add language that simply is not there. *Petition of Famous Brands, Inc.*, 347 N.W.2d 882 (S.D.1984);

*Boehrs v. Dewey County*, 74 S.D. 75, 48 N.W.2d 831 (1951). Furthermore, we should not presume the legislature intended an absurd result. *See, e.g., Metier v. Cooper Transport Co., Inc.*, 378 N.W.2d 907 (Iowa 1985); *Zieger Osteopathic Hospital, Inc., v. Wayne County*, 139 Mich. App. 630, 363 N.W.2d 28 (1984); *State v. Sinica*, 220 Neb. 792, 372 N.W.2d 445 (1985). To adopt LeMars' interpretation of the statute would virtually destroy the long-established practice of settling legitimate cases to avoid congesting the court system and to relieve insureds from the expense, rigors and unknowns of trial. To require a judgment before *any* payment on an underinsured motorist coverage claim would be tantamount to holding that such cases could never be settled before trial. This proposition is totally ludicrous.

LeMars additionally argues that the policy language unambiguously requires that the underinsured policy owner reduce his claim against the underinsured tort-feasor to judgment as a condition precedent to payment of underinsured benefits. The relevant policy provision states:

The company shall not be obligated to make any payment because of bodily injury to which this insurance applies and which arises out of the ownership, maintenance or use of an underinsured highway vehicle until:

(a) the limits of liability under all bodily injury liability bonds or insurance policies applicable at the time of accident have been exhausted by payment of judgment or settlements; *and*

(b) the insured has secured a judgment against the owner of the underinsured highway vehicle in excess of such liability bonds or insurance policy. (Emphasis in original.)

▮ This court must construe all provisions of the policy together and ascertain the intention of the parties, if possible. *Peterson v. Great American Ins. Co.*, 74 S.D. 334, 52 N.W.2d 479 (1952); *Thompson v. State Automobile Ins. Ass'n*, 70 S.D.

---

**3.** For present purposes the current version of the statute contains no material change from the 1975 enactment quoted in the text.

412, 18 N.W.2d 286 (1945); *Hemmer-Miller Development Co. v. Hudson Ins. Co. of New York*, 59 S.D. 129, 238 N.W. 342 (1931). *See also* SDCL 58–11–39. Obviously, an insurance policy must be subject to a reasonable interpretation and not one which amounts to an absurdity. *E.g., North Star Mut. Ins. Co. v. Johnson*, 352 N.W.2d 791 (Minn.App.1984); *Olguin v. Allstate Ins. Co.*, 71 Wis.2d 160, 237 N.W.2d 694 (1976); 13 J.A. Appleman & J. Appleman, Insurance Law and Practice § 7386 (1976). As explained above, under the facts of this case it would be absurd to rule that a judgment was mandatory prior to LeMars' duty to pay Olsons' underinsured coverage.

■ LeMars additionally argues that irrespective of any breach of its good faith duty, the judgment must be set aside since Olsons did not prove any damages as a result of LeMars' failure to settle.[4] In *Kunkel, supra*, and *Crabb, supra*, this court approved damages awards equal to the amount the judgment taken against the insured exceeded policy limits. In *Kunkel* and *Crabb*, however, the insured was the tort-feasor who either sued his insurance company or assigned his cause of action to do so to the injured party. The justification for imposing liability upon the insurance company equal to the amount in which the judgment exceeded policy limits was that the company's bad faith failure to settle resulted in its insured being subject to liability for this excess amount. *Crabb*, 205 N.W.2d at 638 (quoting *Lange v. Fidelity & Casualty Company of New York*, 290 Minn. 61, 185 N.W.2d 881 (1971)). *See also Strand v. Travelers Ins. Co.*, 300 Minn. 311, 219 N.W.2d 622 (1974). In the present case, it is the tort victims who are suing their own insurance company. The same justification for assessing damages equal to the excess liability does not exist because the insured plaintiffs are not subject to a judgment in that amount. However, this court also stated in *Crabb*, that if an insurance company were not required to pay the excess liability amount its "respon-

siveness to its well-established duty to give equal consideration to an ... insured's interests would tend to become meaningless." *Id.* at 638 (quoting *Lange, supra*). This concept applies with equal force to an insurer's duty to the purchaser of underinsurance. In short, we find the verdict of $55,500 an appropriate amount to be awarded in light of all of the facts and circumstances present.

Lastly, LeMars argues it is entitled to have the jury verdict reduced by $50,000 because of its subrogation interests in the judgment against Helmbolt. This right was asserted in LeMars' counterclaim against Olsons. LeMars argued that Olsons were subject to the offset as Helmbolt's assignees. As noted above, Olsons moved for summary judgment on the counterclaim on the grounds that the portion of the judgment against Helmbolt in which LeMars asserted the subrogation interest was satisfied by the partial satisfaction of judgment entered at LeMars' request. In response to this argument, LeMars moved the court to modify the satisfaction of judgment to reflect that the $50,000 was not satisfied. The trial court denied Olsons' motion for summary judgment, granted LeMars' motion to modify the satisfaction of judgment, and ruled the subrogation claim was still viable against Helmbolt. However, the trial court would not allow the jury to consider the assignment from Helmbolt as an offset to Olsons' claim against LeMars. Olsons also appeal on this issue by way of notice of review, arguing their motion for summary judgment was improperly denied.

This court agrees with LeMars that SDCL 58–11–9.6 does in fact provide that the underinsured motorist coverage insurer will be subrogated to the rights of its insured for any amount the insurer pays. However, there is no question that Lemars filed a $101,293.70 partial satisfaction of judgment it received from Olsons. This satisfaction purported to discharge the $50,000 portion of the Olsons' judgment against Helmbolt in which LeMars claimed

---

**4.** It is obvious how the jury reached its verdict. The $55,500 awarded is equivalent to the $60,- 000 excess judgment, less the $4,500 Helmbolt paid Olsons subsequent to trial.

a right. The issue thus becomes whether this partial satisfaction prevented the subrogation, or whether it was modifiable as the lower court ruled.[5]

We first note "it is *necessary* to an action on a judgment that it be unsatisfied, and an action may not be maintained on a judgment which has been satisfied, particularly where the satisfaction appears *of record.*" 47 Am.Jur.2d *Judgments* § 927 (1969) (emphasis added) (footnotes omitted). Furthermore, SDCL 15–16–16 provides:

> Any partial satisfaction of any judgment rendered or docketed in the circuit courts of this state may be made and noted upon the records in like manner; and thereupon all judgments and liens thereby created, *must be ... canceled and discharged to the extent of the entries so made upon the judgment docket and no more.* (Emphasis added.)

■■■ A trial judge is required to exercise sound discretion in deciding whether the equitable relief of altering a partial satisfaction of judgment should be granted. *Plano Mfg. Co. v. Thompson*, 21 S.D. 300, 112 N.W. 149 (1907). Furthermore, "[n]egligence in making a mistake ... will generally result in a denial of equitable relief." 54 Am.Jur.2d *Mistake, Accident or Surprise* § 22 (1971) (footnote omitted). *See also* J. Pomeroy, Equity Jurisprudence § 843 (5th ed. 1941); 27 Am.Jur.2d *Equity* § 34 (1966).

Since LeMars and LeMars only was negligent in filing the partial satisfaction, and as this "mistake" was left unattended for nearly three years, the trial judge should have granted the motion for summary judgment and ruled as a matter of law that LeMars' subrogation claim was inappropriate.

We have reviewed the other issues raised on appeal and find them to be without merit.

Although we reverse the trial court on the summary judgment issue, the final judgment entered will be in all aspects affirmed.

HENDERSON, J., concurs.

WUEST, C.J., and FOSHEIM, Retired Justice, concur in result.

MORGAN, J., concurs in result in part and dissents in part.

MILLER, Circuit Judge, for SABERS, J., disqualified. (Prior to his appointment as a Supreme Court Justice, Robert A. Miller was appointed in his capacity as a circuit court judge to serve in the place of Justice Sabers in this matter, and the record will reflect that he participated as a circuit court judge.)

WUEST, Chief Justice (concurring in the result).

I concur in the result, but not in the following language of the majority opinion which appears to hold bad faith as a matter of law:

> It seems clear LeMars ignored its duty of good faith for the purpose of protecting its own interest. It also seems readily apparent to this court that the conduct of LeMars prior to the suit against Helmbolt was nothing more than gamesmanship. To allow a company to take the posture LeMars assumed, would at best violate the public policy of this state, not to mention the settled law which requires an insurance company to settle and negotiate in good faith. Furthermore, LeMars' conduct in this case was tantamount to a unilateral revocation or termination of mandatory coverage. On its face, that is a conduct in bad faith.

However, in my opinion there was sufficient evidence for the jury to find bad faith.

I am authorized to state that FOSHEIM, Retired Justice, joins in this concurrence in result.

---

5. At no point did Olsons challenge the motion for partial satisfaction on jurisdictional grounds. We therefore do not reach the issue whether a satisfaction of judgment may be modified or vacated by a court other than the one which entered the judgment referred to in the satisfaction.

MORGAN, Justice (concurring in result in part, dissenting in part).

I concur in the result of the first issue regarding bad faith (the first two issues raised in LeMars' brief) and I dissent on the second issue regarding the subrogation rights (the last two issues in LeMars' brief).

First I take exception to the language in the majority opinion that states LeMars' knowledge "that Helmbolt would not have the finances to cover an excess judgment" is a factor to be considered in determining bad faith on the part of LeMars.

On the bad faith issue, as denominated by the majority opinion, I concur in the result only. In my opinion the majority chooses to ignore the simple fact that this lawsuit involves two separate and distinct contracts of insurance. Rather, the two contracts and their resultant duties are mixed together like the yolks of two eggs in a plate of scrambled eggs. While the majority extemporizes on the "catch–22" language of Olsons' attorney's letter, it fails to appreciate in the slightest degree the dilemma faced by LeMars.

The first policy that should be discussed is the liability coverage afforded Helmbolt. Under the facts in this case, I would agree that LeMars would probably be guilty of bad faith if they had an opportunity to offer the $50,000 limits of the liability coverage in full settlement and had failed to do so. But that is not the factual scenario in this case. LeMars did offer the liability limits in full settlement, but the offer was rejected. It is the demands of Olsons' attorney upon which the majority relies, not that of Helmbolt's attorney. The record reflects that Olsons' attorney did indeed make some demand to the effect that Le-Mars settle for the limits of the combined coverages. Neither Helmbolt, nor his attorney, have any standing to urge payment of any coverage beyond the policy limits of the liability policy.

With respect to the underinsurance coverage afforded Olsons under their policy, I now point out the dilemma facing LeMars which the majority ignores. Any settlement arrived at under this policy automatically creates a subrogation claim for Le-Mars against Helmbolt by the clear language of the policy and by the provisions of SDCL 58–11–9.6, which provides: "The issuer of the underinsured motorist coverage *shall* be subrogated to any amounts it so pays, and upon payment *shall* have an assignment of the judgment against the other party to the extent of the money it pays." (Emphasis added.) This hardly comports with LeMars' duty to defend Helmbolt under his liability coverage. Under this fact situation I would find as a matter of law that no bad faith existed. The fact that the verdict exceeded the $100,000 combined limits is immaterial. The LeMars internal memos referred to damages only in sums of $60,000 to $80,-000.

Nevertheless, having pointed out what I believe to be adequate grounds to reverse the judgment, I must join in the majority in affirming because of the posture of the case on this appeal. LeMars raises no issues in this appeal attacking the trial court's instructions or evidentiary rulings. Thus, under our prior rulings, the instructions become the law of the case,[*] and the jury decided any factual disputes under the instructions. I am therefore compelled to concur in the result.

On the second issue, which deals with subrogation rights, I respectfully dissent. The trial court ruled before trial that Le-Mars was entitled to a set-off of the $50,-000 paid under Olsons' policy. In my opinion this ruling was correct under the terms of the policy and the statutory provision that I quoted above. The partial satisfaction upon which the majority relies, as I understand, was given by Olsons with respect to a judgment against Helmbolt, in which action LeMars was not a party. This lawsuit, the so-called bad faith action, is a different lawsuit and lies between the insureds and the insurer. The insureds rely on the policy provisions to show bad faith, and the insurer should be able to rely on the provisions of those same policies to

[*] *Byre v. City of Chamberlain,* 362 N.W.2d 69 (S.D.     1985).

show the contractual and statutory rights. Both Olsons and Helmbolt were represented by their own counsel and there is no showing in this record that LeMars had anything to do with the preparation of the partial satisfaction. Finally, the trial court made no record of its reason for reneging on its earlier ruling.

I would reverse the decision of the trial court on this issue and remand with instructions to enter a new judgment setting off the subrogation claim which Olsons assigned to LeMars by accepting the payment under the provisions of their policy. Thus, Olsons will have the $100,000 paid under the limits of the two policies plus $4,500 paid by Helmbolt and another $5,000 on the judgment in this case. It is a fact of life that there are many occasions where the injuries and damages exceed the coverage afforded by insurance. That does not make the insurers automatic insurers of that excess.