Christine L. KIRCHOFF, Appellee,

v.

AMERICAN CASUALTY COMPANY, OF READING, PENNSYLVANIA; CNA Insurance Companies, Appellants.

Christine L. KIRCHOFF, Appellant,

v.

AMERICAN CASUALTY COMPANY, OF READING, PA; CNA Insurance Companies, Appellees.

Nos. 92–2705, 92–2707.

United States Court of Appeals, Eighth Circuit.

Submitted Feb. 16, 1993.

Decided June 30, 1993.

Charles Spevacek, Minneapolis, MN, argued (Richard L. Pemberton, Jr., Minneapolis, MN, and J. Crisman Palmer, Rapid City, SD, on the brief), for appellants.

Thomas E. Simmons, Rapid City, SD, argued, for appellee.

1.  CNA is comprised of nine insurance companies. Continental Casualty Company, the lead company of the CNA group, directly or indirectly owns and controls the other group members, including American Casualty Company of Reading, Pennsylvania.

2.  Underinsured motorist coverage allows the insured to "collect the amount of that insured's own coverage less the amount of the tortfeasor's

Before BOWMAN, WOLLMAN, and HANSEN, Circuit Judges.

BOWMAN, Circuit Judge.

In this challenge to a jury verdict assessing liability against an insurer for bad faith in the handling of a claim, defendants American Casualty Company of Reading, Pennsylvania, and CNA Insurance Companies (collectively CNA)[1] appeal the District Court's denial of their motions for judgment as a matter of law or, in the alternative, for a new trial. Plaintiff Christine Kirchoff cross-appeals the court's denial of her request for attorney fees. We affirm in part and reverse in part.

This case arose as a result of a rear-end collision on February 1, 1989, near Black Hawk, South Dakota. Christine Kirchoff's husband was driving a Chevrolet Suburban owned by his employer, API, a building materials supplier. Christine Kirchoff was a passenger in the Suburban. It was stopped at an intersection when a vehicle driven by William Gartland struck it in the rear, injuring Christine Kirchoff. Gartland had $300,-000 worth of liability insurance coverage with Maryland Casualty Company, and API carried $1,000,000 worth of underinsured motorist coverage[2] on the Suburban under a policy purchased from CNA.

Christine Kirchoff was treated immediately after the accident in the emergency room of a Rapid City hospital. Several weeks later, because her back pain had not subsided, she visited the physician who previously had treated her for back problems.[3] On May 12, 1989, Kirchoff had a laminectomy, later determined to be unsuccessful. After recovering from the surgery, she continued working only a few hours a day at her job as a claims representative for American Concept Insurance Company.

liability coverage." 7 Patrick D. Kelly, *Blashfield Automobile Law and Practice* § 315.1, at 534 (rev. 3d ed. 1987).

3.  Kirchoff had a successful laminectomy in 1986. A laminectomy is surgical removal of the posterior arch of a vertebra. Richard Sloane, *The Sloane–Dorland Annotated Medical–Legal Dictionary* 403 (1987).

In September 1989, in the face of objectively documented back injuries and the failed laminectomy, Kirchoff's physician advised her to quit working, and she did so. In December 1989, she notified CNA that her doctors had told her that she was totally vocationally disabled and that she probably would not work again in her position as claims representative. She then told CNA that she would be making a claim on API's underinsured motorist coverage.[4] She informed CNA that she calculated that her lost wages alone had a value of at least $1,800,-000. Kirchoff followed up with a letter received by CNA in January 1990. In February 1990, Kirchoff contacted CNA to advise that Maryland Casualty, Gartland's insurer, had arranged for independent medical examinations (IMEs) of her injuries. She told Janice Millford, the CNA claims representative, that Maryland Casualty had told her that, if the physicians performing the IMEs reached the same conclusion as her treating physicians, Maryland Casualty would tender their limits. Millford testified that she was unable to verify that statement with Maryland Casualty.

Both parties acknowledge that CNA had no obligation to pay anything under the underinsurance policy unless and until Maryland Casualty tendered its limits under Gartland's insurance policy. If Kirchoff's damages attributable to Gartland's liability were determined to be less than $300,000, then CNA was not liable under the underinsurance motorist coverage carried by API. On May 8, 1990, Kirchoff told Millford that Maryland Casualty had tendered its limits.[5] Millford received verbal confirmation of the tender from Maryland Casualty on May 14, and written confirmation on May 22.

During the next month, there were several telephone conversations between Millford and Kirchoff, which apparently were becoming steadily more antagonistic. During this time, Kirchoff sent Millford her "settlement packet," that is, her demand and the documentation for it. She also began attempting to make audio recordings of her conversations with Millford, without Millford's knowledge or consent, although her equipment failed to record any of their conversations save those that took place on June 27 and July 9, 1990. Kirchoff also asked a third party to prepare an estimate on a structured settlement whereby, for a fixed sum paid up front and invested in an annuity, Kirchoff would receive a steady income paid out over a number of years. There was some reference to structured settlement in at least one of the conversations between Millford and Kirchoff, but Kirchoff never sent a structured settlement proposal to Millford, nor did she tell Millford she had sought and received such a proposal.

As of June 27, 1990, Kirchoff was asking CNA for $1,000,000 to settle her underinsured claim. With Maryland Casualty having tendered its limits, however, the most CNA would have been required to pay under API's policy was $700,431.31 (although Kirchoff, throughout her negotiations with CNA, disputed that any setoff applied). Millford was offering Kirchoff only $8000, CNA's estimated costs to defend a lawsuit seeking payment under the policy, even though Millford valued Kirchoff's claim at $10,000. There was evidence, however, that Millford had placed a "case estimate," an internal valuation for purposes of maintaining proper reserves, of $300,000 in "new" money on Kirchoff's claim, over and above the nearly $300,000 that Maryland Casualty tendered Kirchoff. Also, in May 1990 Millford had the Kirchoff file duplicated and sent to the home office, a procedure that ordinarily was not undertaken unless the case estimate exceeded office authority (in this case $150,000), so that the file and the case estimate could be reviewed by a supervisor. (This file was not reviewed by the home office until August 1990, at which time a $300,000 case estimate was approved.) In seeming contradiction to these actions, however, Millford's statements in the file and in internal correspondence, as

---

4. CNA had been paying the medical expenses that resulted from the injuries Kirchoff received in the accident under the medical coverage provision of API's liability policy.

5. Actually, Maryland Casualty settled with Kirchoff for $299,568.69. The remainder of Gartland's $300,000 limits of liability coverage, $431.31, went to API for property damage to the Suburban.

well as in correspondence to Kirchoff, *see infra* n. 6, indicated that her original valuation of $10,000 remained unchanged, and that she believed the settlement with Maryland Casualty fully compensated Kirchoff for her injuries. Millford testified that the $300,000 case estimate was a mistake, and that she really did not believe the total value of the case—Maryland Casualty's tender plus "new" money—to be $600,000. In the June 27, 1990, telephone conversation with Millford, Kirchoff threatened a lawsuit to collect underinsured benefits and also threatened a bad-faith lawsuit. By letter dated July 9, 1990, Millford confirmed to Kirchoff her understanding of the status of the negotiations—essentially that they had reached a standoff.[6]

With neither party willing to compromise their widely disparate offers to settle, negotiations broke off, and Kirchoff filed suit on September 21, 1990. The original lawsuit, filed in the District Court under its diversity jurisdiction, alleged two causes of action: one sounding in contract for payment under API's underinsured motorist policy for Kirchoff's injuries received in the rear-end collision, and one sounding in tort for CNA's alleged bad faith in the handling of Kirchoff's underinsured motorist claim. The court bifurcated the suit, trying the contract action first, and a jury found Christine Kirchoff had sustained $475,000 in damages as a result of the accident. (Gartland's liability was undisputed.) Deducting the amount Maryland Casualty had paid to Kirchoff, the court entered judgment against CNA for $175,431.31.

The bad-faith case went to trial after that, and the jury returned a verdict against CNA, finding liability in the amounts of $84,000 in actual damages and $141,000 in punitive damages. The sum and substance of the actual damages was Kirchoff's attorney fees in bringing the contract suit, plus $12,000 for loss of use of the amount for which CNA was liable in the contract case. CNA appeals, asking us to reverse both the actual damages and the punitive damages awards. Kirchoff cross-appeals the District Court's denial of her motion for attorney fees in the bad-faith case.

CNA claims it was entitled to judgment as a matter of law on Kirchoff's bad-faith claim because the evidence was insufficient to support a finding of liability. We disagree.

In reviewing the trial court's decision to deny CNA's motion for judgment as a matter of law, we examine the entire record in the light most favorable to Kirchoff, "mindful of the requirements of the governing substantive law for the imposition of liability." *Linegar v. Armour of America, Inc.*, 909 F.2d 1150, 1152 (8th Cir.1990). We look to South Dakota substantive law to determine if the court erred in denying judgment as a matter of law.

South Dakota law recognizes a cause of action for an insurer's bad faith in refusing to settle a claim within policy limits, and permits recovery when the interests of the insured and the insurer are not given equal consideration. *See Crabb v. National Indem. Co.*, 205 N.W.2d 633, 635 (S.D.1973); *see also Champion v. United States Fidelity & Guar. Co. (In re Certification of a Question of Law)*, 399 N.W.2d 320, 322 (S.D. 1987). An insurer may not "ignore[ ] its duty of good faith for the purpose of protecting its own interest." *Helmbolt v. LeMars Mut. Ins. Co.*, 404 N.W.2d 55, 58 (S.D.1987). The jury instruction on bad faith in this case, which is not challenged in this appeal, was

---

**6.** The text of the letter is as follows:

We discussed the limits of insurance available and I expressed an opinion that we would be allowed to take an offset for the settlement you reached with Maryland Casualty from the $1,000,000 limits. Therefore, I felt that the maximum exposure after the offset would be $700,431.31. I then expressed the company's evaluation that your claim had been satisfied by collecting $299,568.67 [sic] from Maryland Casualty, however, in an effort to compromise this matter, an offer of $8,000 was extended to you for any underinsurance claim you believed existed. You rejected that offer and indicated that you would be pursuing this matter into litigation.

We will await receipt of the Summons and Complaint from our named insured. If your legal representative wishes to contact us to discuss negotiations further or should you decide not to pursue the matter through litigation and continue settlement negotiations yourself, please feel free to contact us at your convenience.

Letter of July 9, 1990, from Janice L. Millford to Christine Kirchoff.

taken from the *Champion* case, wherein the South Dakota Supreme Court, holding that a party could sue a workers' compensation insurer for bad faith, adopted a two-part test for bad-faith liability. *See Champion*, 399 N.W.2d at 324. Under the test, bad-faith liability attaches if, first, the insurer has no reasonable basis for denying benefits, and, second, the insurer knows or recklessly disregards the fact that it has no reasonable basis upon which to deny benefits. *Id.* (quoting *Travelers Ins. Co. v. Savio*, 706 P.2d 1258, 1275 (Colo.1985) (quoting *Anderson v. Continental Ins. Co.*, 85 Wis.2d 675, 271 N.W.2d 368, 377 (1978))). Denial of benefits may be inferred from the insurer's failure to process or pay a claim, and the requisite knowledge (or reckless disregard) on the part of the insurer may be inferred when the insurer has exhibited "a reckless indifference to facts or to proofs submitted by the insured." *Id.*

■ We have reviewed the record here and, viewing the facts in the light most favorable to Kirchoff, we believe that the jury's verdict must stand. CNA claims it never denied payment to Kirchoff, as evidenced by its first (and only) offer of $8000. But Kirchoff testified that she believed CNA's offer to pay only its estimated defense costs was effectively a denial of her claim. While that might not be the conclusion one would expect of an experienced insurance claims representative such as Kirchoff, it could be the conclusion of a reasonable person. And, as noted above, denial may be inferred from CNA's failure to process or pay the claim.

We further conclude that the jury easily could have found CNA had no reasonable basis for refusing to settle with Kirchoff, and knew as much, given the uncontested independent medical reports Kirchoff submitted. Although no liability attaches where the insured's claim is "fairly debatable," we do not agree with CNA's contention that Kirchoff's request for $1,000,000 ($300,000 in excess of the policy limits) renders her claim against the underinsured motorist policy "fairly debatable." The factual basis for Kirchoff's claim—Gartland's liability and the permanent

and serious nature of her injuries—was unchallenged by CNA, even if the value of the claim was subject to dispute. CNA had a duty to negotiate settlement in good faith, and the jury's conclusion that CNA's offer of $8000 was not in good faith is sufficiently supported by the evidence.

CNA argues, in the alternative, that it is entitled to a new trial because of a trial error by the District Court. According to CNA, the court erred in allowing evidence of Millford's $300,000 case estimate, and CNA was prejudiced by the admission of that evidence.

■ The admission of evidence by the trial court is reversible error only if we find that the court abused the broad discretion entrusted to it on evidentiary matters. *Tioga Pub. Sch. Dist. # 15 v. United States Gypsum Co.*, 984 F.2d 915, 923 (8th Cir.1993). We make no such finding here.[7]

■ CNA contends that evidence of the case estimate is irrelevant to the question of whether and to what extent CNA was obliged to pay Kirchoff under API's contract of insurance, stating in its brief that "[r]eserve or case estimate information is neither discoverable nor relevant in resolving disputes as to obligations under an insurance contract." Brief of Appellants at 34. We make no specific finding on that argument as presented, however, because the case estimate was admitted here, in Kirchoff's tort case, as evidence of CNA's bad faith in handling Kirchoff's claim under the contract, not as evidence of CNA's liability under the contract. Clearly, if Janice Millford valued Kirchoff's claim at $300,000 (and CNA concedes for purposes of this appeal that she did) but offered only $8000 to settle Kirchoff's claim, evidence of that valuation was relevant to the issue of whether CNA's settlement offers were made in good faith. The District Court did not abuse its discretion in receiving such evidence.

For its final issue on appeal, CNA submits that the evidence did not support an award of punitive damages. Having carefully reviewed the entire record, we agree.

---

7. Kirchoff claims that CNA's objection to the evidence was not properly preserved for appel- late review. In view of our holding on the merits, we do not consider that argument.

■ Under South Dakota law, an award of punitive damages for bad faith in handling an insurance claim must be supported by evidence of actual or presumed malice. *See Bierle v. Liberty Mut. Ins. Co.*, 992 F.2d 873, 876 (8th Cir.1993) (applying South Dakota law). As no evidence of actual malice—"a positive desire and intention to injure ... another, actuated by hatred or ill will towards that person," *Case v. Murdock*, 488 N.W.2d 885, 891 (S.D.1992)—was demonstrated or is argued here, there must be presumed malice on the part of CNA if the verdict is to stand.

■ Malice sufficient to justify an award of punitive damages may be inferred from the challenged behavior—that is, presumed—if it can be shown that the liable party's actions were willful or wanton. *Bierle*, at 876. Thus CNA must have "consciously realized" that its conduct would cause harm to Kirchoff. *Flockhart v. Wyant*, 467 N.W.2d 473, 478 (S.D.1991) (quoting *Tranby v. Brodock*, 348 N.W.2d 458, 461 (S.D.1984)). Presumed malice "implies that the act complained of was conceived in the spirit of mischief or criminal indifference to civil obligations." *Case*, 488 N.W.2d at 891. We conclude, as a matter of law, that Kirchoff failed to prove the necessary malice on the part of CNA in handling her claim. Millford knew that Kirchoff was an experienced claims representative in her own right, and had seen that she was a tough negotiator and was not timid in asserting her rights as she saw them. Thus Millford would not have had the conscious realization that CNA's conduct would, "in all probability," cause harm to Kirchoff, such as a finding of presumed malice requires. *Flockhart*, 467 N.W.2d at 478 (quoting *Tranby*, 348 N.W.2d at 461). There simply is no evidence in the record that CNA "act[ed] willfully or wantonly to the injury of" Kirchoff, *Dahl v. Sittner*, 474 N.W.2d 897, 900 (S.D.1991), nor that CNA had any desire to cause injury to her, as distinguished from a desire to protect its own interests by not overcompensating her. CNA is entitled to judgment as a matter of law on the issue of punitive damages.

In her cross-appeal, Kirchoff challenges the District Court's refusal to award her attorney fees for this action. She claims she is entitled to fees pursuant to South Dakota Codified Laws Annotated § 58–12–3 (1990 revision), which reads in relevant part:

> In all actions or proceedings hereafter commenced against any ... insurance company ... on any policy or certificate of any type or kind of insurance, if it appears from the evidence that such company ... has refused to pay the full amount of such loss, and that such refusal is vexatious or without reasonable cause, the department of labor, the trial court and the appellate court, shall, if judgment or an award is rendered for plaintiff, allow the plaintiff a reasonable sum as an attorney's fee to be recovered and collected as a part of the costs....

A party is entitled to a hearing to determine whether the insurer's conduct is such that she is eligible for an award of fees and, if so, to determine the amount to be awarded. S.D. Codified Laws Ann. § 58–12–3.1 (1990 revision). Kirchoff insists that she was entitled to such a hearing, and ultimately to an award of fees.

■ The District Court declined to grant a hearing, concluding that South Dakota law precluded an award of fees to Kirchoff on this action. We review the court's determination of state law *de novo*. *Salve Regina College v. Russell*, 499 U.S. 225, ——, 111 S.Ct. 1217, 1221, 113 L.Ed.2d 190 (1991).

■ Like the District Court, we think that South Dakota law on this question is clear. *See Crabb*, 205 N.W.2d at 639. This was not a proceeding on an insurance policy; that action was the first trial of this bifurcated case, and Kirchoff received a favorable verdict at the conclusion of that trial. Her present claim for attorney fees is based on her bad-faith claim—a tort action. This action included her claim for punitive damages, which are unavailable under South Dakota law in contract actions. There is no indication in the record that Kirchoff requested attorney fees following the first trial, the proceeding on the policy, and in fact she was compensated for those fees by the actual

damages awarded in this action.[8] We see no provision in South Dakota law for assessment of attorney fees in tort actions challenging an insurer's handling of an insurance claim. We conclude that attorney fees were properly denied.

We remand the case to the District Court with instructions to enter judgment as a matter of law in favor of CNA on Kirchoff's punitive damages claim. In all other respects, the judgment is affirmed.

8. We express no opinion on whether CNA's conduct reached the necessary level of vexatiousness to warrant an award of fees under South Dakota law if the request for fees had been one that could properly be considered under the statute.