Michael SCHULTZ, as Special Administrator of the Estate of Thad Michael Schultz, Deceased, Plaintiff,

v.

HERITAGE MUTUAL INSURANCE COMPANY, Defendant.

No. CIV 93–4208.

United States District Court,
D. South Dakota,
Southern Division.

Oct. 23, 1995.

Bruce M. Ford, Burns & Ford, N. Dean Nasser, Jr., Sioux Falls, SD, for plaintiff.

John E. Simko, Jr., James E. Moore, Woods, Fuller, Shultz & Smith, Sioux Falls, SD, for defendant.

## MEMORANDUM OPINION AND ORDER

PIERSOL, District Judge.

Defendant Heritage Mutual Insurance Company moves for summary judgment and to strike paragraphs three through eight of plaintiff Michael Schultz's affidavit dated June 30, 1995. Plaintiff has responded to both motions. For the reasons discussed below, the Court grants defendant's motion to strike and denies defendant's motion for summary judgment.

The Court must grant defendant's motion for summary judgment if there are no genuine issues of material fact for trial and defendant is entitled to judgment as a matter of law. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). The Court must consider the facts in the light most favorable to plaintiff, the non-moving party, and give him the benefit of all reasonable factual inferences. *See Robinson* *v. Monaghan,* 864 F.2d 622, 624 (8th Cir. 1989).

This is a diversity suit to recover underinsured motorists coverage (UIM) brought by plaintiff Michael Schultz following the death of his son, Thad Schultz, as the result of an automobile accident on January 24, 1992. Taking the facts in the light most favorable to plaintiff, the record shows the following.

On the early afternoon of January 24, 1992, Thad Schultz, who was then 19 years old, left Rapid City, South Dakota, by car with two of his friends, Ben Coburn, who was then 18 years old, and Shawn Deinert, who was 19, to travel east: Deinert to his parents' house near Mt. Vernon, Schultz to his parents' house in Brandon, and Coburn to his parents' house near Garretson, all communities in South Dakota. Coburn drove the entire trip. Schultz was a passenger in the front seat, and Deinert sat in the back seat. Before leaving, the three men obtained beer, but the parties dispute how much beer was purchased and who paid for it. As they left Rapid City, the weather was foggy. All three men drank beer during the trip, but the parties dispute how much each man drank.

After traveling four to five hours, the three men stopped at Deinert's home near Mt. Vernon. Schultz and Coburn entered the Deinert home and visited a few minutes. Deinert's parents testified that they could not tell that Coburn and Schultz had been drinking, and only their son brought a can of beer into the house. Coburn and Schultz then continued on to Mitchell, a few miles away, where they stopped at a fast-food restaurant for fifteen minutes so Schultz could eat. Back on Interstate 90 heading east, Coburn noticed that the weather had cooled, the wind was blowing and it was starting to drizzle. Coburn continued to drink beer. Schultz fell asleep about five minutes out of Mitchell. The weather continued to deteriorate. Approximately twenty miles east of Mitchell, Coburn topped a hill, came suddenly upon a semi-truck, and as he swerved to the left lane, he clipped the left rear bumper of the truck. The car came to rest in the median. Schultz was killed instantly by a fractured second cervical vertebrae.

South Dakota Highway Troopers apprehended Coburn in a field near the accident scene. Trooper Larry Englund observed a strong odor of alcohol on Coburn's breath and his eyes were bloodshot and glassy. Troopers removed from the vehicle twelve unopened cans of Old Milwaukee beer, ten empty Old Milwaukee beer cans, one cardboard twelve-pack container for Old Milwaukee Light beer, and one partial container for Bud Light beer. Coburn's blood alcohol content after the accident was .222. Schultz's blood alcohol content, determined by the state health laboratory, was .048. Coburn later pleaded no contest to a charge of vehicular homicide.

Coburn's vehicle was insured by Capitol,[1] with a liability limit of $100,000 per person. Schultz was an insured under a policy issued to his father, Michael Schultz, by defendant Heritage, with underinsured motorist coverage in the amount of $300,000 per person. Michael and Geri Schultz, individually and as representatives of Thad's estate, entered into settlement negotiations with Capitol and Heritage through counsel, N. Dean Nasser, Jr. The Schultzes and Capitol reached an agreement to settle the estate's claim against Coburn for $80,000.

On October 15, 1993, Nasser wrote a lengthy letter to Gene Vostad of Heritage Insurance, informing him of the imminent settlement with Capitol and providing Heritage thirty days in which to substitute its draft for the one tendered by Capitol. Nasser stated that his clients were willing to waive the balance of the liability policy limit (the $20,000 gap) and give Heritage a $100,000 credit against any liability which might be found to exist in further proceedings against Coburn (if Heritage substituted its draft) or against Heritage directly on UIM coverage (if Heritage did not substitute its draft). Nasser informed Vostad that he was following the procedure set out in *Schmidt v. Clothier*, 338 N.W.2d 256 (Minn.1983), because two South Dakota circuit courts had adopted the procedure, even though the

South Dakota Supreme Court has not adopted it. Nasser enclosed copies of various South Dakota and Minnesota cases, and he indicated that his clients would still consider a global settlement.

Heritage responded through an October 22, 1993 letter written by its Litigation Manager, Bill Blackman. Blackman stated that "you went to considerable and possibly unnecessary research in explaining the waiver of subrogation/substitution of funds issues. I was the adjuster involved on behalf of Western regarding *State Farm v. Western* and in fact I am quite familiar with the *Schmidt v. Clothier* procedures having settled numerous UIM claims in North Dakota, South Dakota and Iowa." (Doc. 23, Attachment 2.) Blackman clarified "for the record" that Heritage would waive its subrogation rights in the $7,000 it had already paid its insureds and refused to substitute drafts. Blackman then stated:

> You may therefore proceed with Capitol as you wish. I will comment about "global" settlement towards the end of my letter.
>
> I fully understand that settlement for less than the underlying limits does not preclude the Schultz Estate from pursuing UIM benefits. I am also quite confident that a full $100,000 set off would apply....

> .     .     .     .     .

I assume you would have to prevail [at trial] in excess of $107,000 in order to affect any further payment from Heritage.... I urge you at this time to contact your client advising that in order to avoid any legal expenses, Heritage is offering $5,000 above and beyond whatever the ultimate conclusion with Capitol is. *In essence we would consider this to be a total claim value of $112,000.*

It's not my call, but if you are confident that the value of this matter is well in excess of $100,000, $20,000 should not be left on the table. I understand rationale of

---

1. The full, correct name of this insurance company is not apparent from the record. The names "Capital Indemnity Company," "Capitol Insurance," "Capitol Insurance Group, Inc.," "Capital Insurance Group, Inc.," "Capitol," and "Capi-

tal" appear throughout the record. The Court will use the name "Capitol," but quoted documents containing any formulation of the name will remain in original form.

settlement for less than the policy limits, but that logic suggests that the "gap" or reduction in settlement off the limits is based on liability and/or damages disagreements.... *At some point it would be necessary for you to explain why $20,000 was left on the table....*

Based on the above discussions, *I would urge your clients to accept what is essentially a $112,000 total settlement offer* as they would have to exceed that amount at trial without further expense to better their current position.

(Doc. 23, Attachment 2, emphasis added.)

On November 1, 1993, Nasser sent Blackman a reply conveying his clients' decision to reject Heritage's offer of waiver of subrogation as to $7,000 and $5,000 additional cash, noting they previously offered to settle for $100,000 of Heritage's $200,000 exposure. On November 10, Nasser submitted a counteroffer to Heritage in the amount of $62,500. Blackman responded the same day by rejecting the counteroffer and reiterating its previous offer. Below Blackman's signature, the letter stated: "P.S. Heritage confirms it is waiving the balance of the 30 day waiting period. *The Thad Schultz Estate may proceed [at] its convenience in concluding with Capitol.*" (Doc. 23, Attachment 6.) On November 12, 1993, the Schultzes executed the $80,000 settlement with Capitol by signing a release of Coburn and Capitol which included the following language:

> However, nothing in this release should be understood as a release, or waiver of any underinsured motorist ("UIM") benefits which may be available to compensate the undersigned for claims arising out of the death of Thad Michael Schultz and the right to bring such claims is specifically retained, *provided that* it is acknowledged that the per person limits of the policy issued by Capital Insurance Group, Inc., under which Benjamin Coburn is identified as a driver, is $100,000 and any UIM carrier will be afforded a credit of $100,000 toward any claims arising out of said accident, as if the full $100,000 per person limits were paid.

(Doc. 23, Attachment 7, emphasis in original.)

Michael Schultz, as Special Administrator of the Estate of Thad Michael Schultz, brought this suit against Heritage in December 1993 to recover UIM benefits. Defendant moves for summary judgment on two issues. First, defendant asserts that this action is barred because plaintiff failed to exhaust the limits of Coburn's liability insurance policy. Defendant relies upon the exhaustion clause in the South Dakota Amendatory Endorsement attached to the Heritage policy which states within section "5. Part IV—Underinsured Motorists":

> **We** will pay under this coverage only after the limits of liability under any applicable **bodily injury** liability policies or bonds have been exhausted by payment of judgments or settlements.

(Doc. 37, Dummer Aff., Attachment.) Defendant contends that it expressly conditions its contractual obligation to pay UIM benefits on exhaustion of available liability limits. (Doc. 16, Blackman Aff.) Blackman attests in his Second Affidavit that he discussed settlement negotiations with plaintiff's counsel, Dean Nasser, but:

> [a]t no time during our conversations and negotiations did we discuss the contractual exhaustion clause contained in the South Dakota Amendatory Endorsement to Michael Schultz's insurance policy. Our discussion concerned only the common law procedure for settling a claim against a tortfeasor's liability carrier and then pursuing a claim for underinsured motorist benefits. Specifically, we discussed whether the settlement procedure outlined in *Schmidt v. Clothier,* 388 [338] N.W.2d 256 (Minn.1983), applied in South Dakota. We did not discuss any contractual requirements.
>
> 4. When I wrote to Mr. Nasser on October 22, 1993, my statement of my understanding that settlement for less than the underlying limits would not preclude an action for underinsured motorist benefits was made in the context of discussing *Schmidt v. Clothier's* application in South Dakota. I did not consider then or at any other time before this case was filed the effect of the contractual exhaustion clause.

(Doc. 17.)

The South Dakota Supreme Court has not ruled on a similar exhaustion argument. De-

fendant cites numerous cases from other jurisdictions in which state courts have considered identical or very similar policy language. These courts have held that an exhaustion clause is a valid precondition to the receipt of UIM benefits, *see e.g. Motorists Mut. Ins. Co. v. Grischkan,* 86 Ohio App.3d 148, 620 N.E.2d 190, 193 (1993), and have denied recovery of UIM benefits for failure to settle for the full limits of the tortfeasor's policy. (Doc. 14 at 3–6.) The cases cited are supportive of defendant's position, but two of the cases distinguish an Ohio Supreme Court decision that is supportive of plaintiff's position. *See Bogan v. Progressive Cas. Ins. Co.,* 36 Ohio St.3d 22, 521 N.E.2d 447, 453 (1988) (holding that an injured insured satisfies the exhaustion requirement "when he receives from the underinsured tortfeasor's insurance carrier a commitment to pay an amount in settlement, the injured party retaining the right to proceed against his underinsured motorist insurance carrier only for those amounts in excess of the tortfeasor's policy limits."), *distinguished in Biondic v. Nationwide Mut. Ins. Co.,* 51 Ohio App.3d 179, 555 N.E.2d 976, 978 (1988), and *Grischkan,* 620 N.E.2d at 194.

Defendant further argues that the exhaustion clause bars this action unless the clause is unenforceable in South Dakota, and plaintiff does not give any reason why the clause is unenforceable. Defendant contends that South Dakota Codified Laws Ann. § 58–11–9.5 determines the limits of underinsured motorist coverage "[s]ubject to the terms and conditions of such underinsured motorist coverage" and the South Dakota Supreme Court has recognized the insurer's right to place conditions on UIM benefits. *See Farmland Ins. Co. v. Heitmann,* 498 N.W.2d 620, 624 (S.D.1993) (holding § 58–11–9.5 applies to UIM policies sold in South Dakota and recognizing legislative intent that contractual provisions not inconsistent with Chapter 58 may be included in policies); *Cimarron Ins. Co. v. Croyle,* 479 N.W.2d 881, 886 (S.D.1992) (refusing to extend UIM benefits contrary to policy's household exclusion). Section 58–11–9.5 provides that the amount of underinsured motorist coverage available depends upon the difference between the underinsured limit and the tortfeasor's liability limit. *See Heit-*

*mann,* 498 N.W.2d at 625; *Winters v. Northwestern Nat'l Cas. Co.,* 838 F.Supp. 440, 444 (D.S.D.1993) (observing that "South Dakota applies a 'difference of the limits' standard.... That is, the limit of the tortfeasor's liability policy (provided it is all paid to the insured) is subtracted from the victim's underinsured motorist coverage limit to determine the amount available from his own insurer."), *aff'd,* 27 F.3d 572 (8th Cir.1994) (Table). A vehicle is not underinsured unless " 'the limit of the applicable bodily injury liability policy is less than the amount needed to compensate the injured party.' " *Winters,* 838 F.Supp. at 444 (quoting *Broton v. Western Nat'l Mut. Ins. Co.,* 428 N.W.2d 85, 90 (Minn.1988)); *Heitmann,* 498 N.W.2d at 625 (quoting *Broton).* Therefore, defendant argues, an exhaustion clause does not contradict this definition of an underinsured motor vehicle because a below-limits liability settlement reflects that the insured is in fact not underinsured. Finally, defendant recognizes that there is some authority for plaintiff's position, but argues that an exhaustion clause is not satisfied if the settlement of the tortfeasor's policy is substantially less than policy limits, citing *e.g., Grischkan,* 620 N.E.2d at 194, and *Biondic,* 555 N.E.2d at 979, and here, a settlement of $80,000 is substantially less than the $100,000 policy limit.

Plaintiff does not directly address any of these cases or arguments. Plaintiff sets out the progression of the settlement negotiations between Nasser and Blackman, then notes, under *Hembolt v. LeMars Mut. Ins. Co.,* 404 N.W.2d 55 (S.D.1987), that an insured is not required to reduce a claim against a tortfeasor to judgment before seeking UIM benefits, and then argues, without citation to authority, that defendant is estopped from asserting the contractual exhaustion clause because plaintiff relied on defendant's representations, made by Blackman, that plaintiff's settlement with Capitol would not preclude him from pursuing UIM benefits. Plaintiff argues that, under *Schmidt, Hembolt,* and § 58–11–9.5, he may recover UIM benefits where he (1) settled for less than the tortfeasor's policy limits; (2) gave defendant a reasonable time to substitute drafts; (3) demonstrated that defendant

declined to substitute drafts; (4) showed that defendant authorized him to settle with Capitol; and (5) gave credit to defendant for the full amount of the liability policy limit.

Plaintiff has filed three affidavits. In the first, dated June 1, 1995, plaintiff states that he is appending the documentation of his counsel's negotiations with Heritage through Blackman, and that these negotiations "were relied on by the Plaintiff which settled with Capitol Insurance Companies and Ben Coburn[.]" (Doc. 23.) In the second affidavit, dated June 30, 1995, plaintiff states in paragraphs three through eight, primarily upon information and belief, his understanding of the negotiations that were conducted by Nasser and Blackman, and he repeats that Blackman led him to believe that exhaustion of the full policy limit was not required before asserting a claim for UIM benefits. (Doc. 25 at ¶ 3.) The affidavit also cites cases in support of plaintiff's estoppel argument, *Garrett v. BankWest*, 459 N.W.2d 833 (S.D.1990), and *Farmers Mut. Auto. Ins. Co. v. Bechard*, 80 S.D. 237, 122 N.W.2d 86 (1963), (*Id.* at ¶ 6), and argues the lack of merit in defendant's position.

Defendant moves to strike paragraphs three through eight of this second Schultz affidavit as containing improper indirect testimony of plaintiff's counsel and improper argument. (Doc. 26.) In response, plaintiff has filed a brief in resistance and a third affidavit, which explains and clarifies each paragraph of the preceding affidavit.

■ The Court grants defendant's motion to strike because paragraphs three through eight of the second affidavit are not proper for the reasons stated by defendant. Plaintiff's first affidavit, containing the attestation that he relied on Blackman's representations, stands as a proper affidavit in opposition to the motion for summary judgment.

In its reply brief on the summary judgment motion, defendant argues that equitable estoppel does not apply here to extend UIM coverage where none can exist by operation of the exhaustion clause because plaintiff cannot show that defendant's specific representations were made before or at the inception of the policy. *See Bechard*, 122 N.W.2d

at 90; *Roseth v. St. Paul Property & Liability Ins. Co.*, 374 N.W.2d 105, 107 (S.D.1985); *American Family Mut. Ins. Co. v. Elliot*, 523 N.W.2d 100, 104 (S.D.1994). In a supplemental reply brief, plaintiff cites *Boyle v. Erie Ins. Co.*, 441 Pa.Super. 103, 656 A.2d 941 (1994), which holds that UIM benefits are available where the insureds settled with the liability carrier for less than the policy limits and gave the UIM carrier a full credit for the liability policy limits.

■■ Defendant's reliance on the *Bechard–Ruotsalainen* rule to argue against the application of estoppel in this case is misplaced. Plaintiff argues that defendant, by Blackman's conduct, waived its right to rely on the exhaustion clause and is estopped from asserting it in this litigation. A waiver exists where one in possession of a right, whether conferred by law or by contract, and with full knowledge of the material facts, does or forbears the doing of something inconsistent with the existence of the right or of his intention to rely upon it. *Western Cas. and Surety Co. v. American Nat'l Fire Ins. Co.*, 318 N.W.2d 126, 128 (S.D.1982); *Wieczorek v. Farmers' Mut. Hail Ins. Ass'n*, 61 S.D. 211, 247 N.W. 895, 897 (1933); *Noem v. Equitable Life Ins. Co.*, 37 S.D. 176, 157 N.W. 308, 309 (1916). " 'To create an estoppel, there must have been some act or conduct upon the part of the party to be estopped, which has in some manner misled the party in whose favor the estoppel is sought and has caused such party to part with something of value or do some other act relying upon the conduct of the party to be estopped, thus creating a condition that would make it inequitable to allow the guilty party to claim what would otherwise be his legal rights.' " *Western Cas. and Surety Co.*, 318 N.W.2d at 128 (quoting *Somers v. Somers*, 27 S.D. 500, 131 N.W. 1091, 1093 (1911)). *See also Roseth*, 374 N.W.2d 105, 108 (S.D.1985) (Henderson, J., dissenting and discussing distinctions in doctrines of estoppel, equitable estoppel, promissory estoppel, estoppel in pais, and detrimental reliance).

■ In *Sander v. Wright*, 394 N.W.2d 896, 898 (S.D.1986), the South Dakota Supreme Court held that the insurance compa-

ny was estopped from asserting a statute of limitations defense because the insured detrimentally relied on the representations of the insurer's adjuster that medical bills would be paid and accordingly failed to bring suit within the limitations period. The court ruled that the circuit court erred in granting partial summary judgment and reversed "because jury questions exist as to equitable estoppel." *Id.* at 899. "Estoppel depends on the facts of each case and ordinarily presents a question for the jury." *Garrett,* 459 N.W.2d at 848. "When the exact nature of the representations and the reasonableness of the reliance upon them are disputed, the issue of estoppel should be presented to a fact finder. In addition, summary judgment is not proper where a state of mind is involved." *Id.*

■ In this case, there is not a dispute as to the exact nature of Blackman's representations, as they are clearly set out in writing. Defendant does not dispute the reasonableness of plaintiff's reliance on Blackman's representations. Therefore, there does not appear to be an issue as to reasonableness to submit to the jury.

Neither is there a "state of mind" issue for the jury. Blackman attests that, at the time he made the representations, he did not have the exhaustion clause in mind, and he discussed with Nasser only the common law as to exhaustion procedures. Blackman's attestation as to what he did or did not have in mind is not material because he made written representations, without stating any qualification between common law and contractual exhaustion, which led plaintiff to rely on his representations. Blackman assured the plaintiff that he fully understood that settlement for less than policy limits would not preclude plaintiff from seeking UIM coverage, and he permitted plaintiff to proceed with the below-limits settlement. By his express conduct he led plaintiff to believe that UIM coverage would still remain after settlement with the tortfeasor. Blackman did not attest that, if he had been thinking about the exhaustion clause at the time he made his representations, he would have proceeded any differently. Thus, the Court rules as a matter of law that defendant is estopped to assert the exhaustion clause to avoid UIM coverage.

■ Alternatively, the Court holds as a matter of law that plaintiff exhausted the limits of Coburn's liability policy by accepting a below-limits settlement and then giving defendant, the UIM carrier, a credit for the full amount of the liability limits. *See Bogan,* 521 N.E.2d at 453; *Boyle,* 656 A.2d at 943–44. To so hold does not contradict, but is consistent with, § 58–11–9.5, which states that the amount of underinsured motorist coverage available depends upon the difference between the underinsured limit and the tortfeasor's liability limit. Where the best settlement available is less than the tortfeasor's liability limits, the insured should not be forced to forego settlement and go to trial. *See Boyle,* 656 A.2d at 943. Yet, the "exhaustion clause must be interpreted to provide protection to an insurance company against a demand by its insured to fill the 'gap' after a weak claim has been settled for an unreasonably small amount." *Boyle,* 656 A.2d at 943. Thus, to balance these competing interests, the exhaustion clause is best construed as a threshold requirement and not a barrier to UIM coverage. *Id.* Plaintiff satisfied the threshold requirement in this case.

Defendant next argues it is entitled to judgment as a matter of law because Schultz was contributorily negligent or assumed the risk when he rode with an intoxicated driver, citing *Sandberg v. Hoogensen,* 201 Neb. 190, 266 N.W.2d 745, 749 (1978) (holding that passenger "may be guilty of contributory negligence or assumption of risk by riding or continuing to ride with a driver who he knows, or in the exercise of ordinary care and diligence, should know, is so intoxicated that he is unable to operate the vehicle with proper prudence or skill."); *Webb v. Stone,* 445 S.W.2d 842, 845 (Ky.1969) (holding that evidence of driver's blood alcohol content was relevant to passenger's contributory negligence); *Biddle v. Biddle,* 414 S.W.2d 136, 137–38 (Ky.Ct.App.1967) (affirming summary judgment based on assumption of risk where driver and passenger together consumed five or six beers in three hours before accident); *Christopherson v. Christensen,* 258 Iowa 648,

**1058**

140 N.W.2d 146, 151–52 (1966) (affirming grant of JNOV based on assumption of risk; driver and passenger drank together before accident); *Harlow v. Connelly,* 548 S.W.2d 143, 144–46 (Ky.Ct.App.1977) (affirming summary judgment based on contributory negligence where passenger and driver drank together for at least three hours before accident). Defendant states that "[i]n *Peters v. Hoisington,* 72 S.D. 542, 37 N.W.2d 410, 413 (1949), the supreme court found that a passenger's contributory negligence could be 'predicated upon the fact that plaintiff knew or should have known that appellant was under the influence of intoxicating liquor.'" (Doc. 14 at 7.)

While this is a true statement, the South Dakota Supreme Court actually held in that case that the issue of contributory negligence was properly submitted to the jury, *Peters,* 37 N.W.2d at 414, and cautioned that "[c]ontributory negligence is a question of law only when the court is impelled to say that from the facts reasonable men can draw but one conclusion pointing unerringly to the negligence of the plaintiff contributing to his injury." *Id.* at 413. Where there was no testimony that the conduct of the driver before the accident indicated intoxication and "from which it can be said as a matter of law that plaintiff knew or should have known that [the driver] was under the influence of intoxicating liquor[,]" the trial court did not err in submitting the issue to the jury. *Id.* at 414.

▮ Plaintiff correctly contends that there are disputed material facts warranting submission of these affirmative defenses to the jury, particularly, whether Schultz was sleeping from the time he and Coburn left Mitchell until the accident and whether Schultz knew or should have known the extent of Coburn's drinking and the state of his intoxication. Taking the facts in a light most favorable to plaintiff, Coburn testified that Schultz slept between Rapid City and Mt. Vernon and that Schultz slept again after he and Coburn stopped in Mitchell. (Doc. 22 at 10.) This testimony is sufficient to overcome summary judgment. Under *Peters,* the Court will permit the jury to determine

whether Schultz was contributorily negligent or assumed the risk. Accordingly,

IT IS ORDERED:

(1) that defendant's motion to strike is granted. (Doc. 26.)

(2) that defendant's motion for summary judgment is denied. (Doc. 13.)